SELF *v.* TAYLOR.

4-9315                                    235 S. W. 2d 45

Opinion delivered December 11, 1950.

Rehearing denied January 22, 1951.

*Jack Rose* and *G. L. Grant*, for appellant.

*Bland, Kincannon & Bethell,* for appellee.

DUNAWAY, J.   This appeal questions the validity of an injunction against picketing in a labor dispute in Fort Smith, Arkansas.   It is urged by appellants that members of the International Brotherhood of Electrical Workers, Local No. 700, have been denied their right of peaceful picketing as guaranteed by the federal constitution.   The Chancellor granted the injunction on the

ground that the union was picketing for an unlawful objective—to obtain a closed shop in violation of Amendment 34, the Freedom to Work Amendment of the State Constitution and Act 101 of the Acts of 1947, the enabling act for enforcement of Amendment 34.

Suit for injunction was brought by appellee, Leon E. Taylor, d/b/a Leon E. Taylor Electrical Company against T. F. Self, individually and as business agent and representative of the International Brotherhood of Electrical Workers, Local No. 700.

On July 1, 1946, Taylor and Local No. 700 entered into a collective bargaining contract covering terms and conditions of employment of appellee's employees. This contract was in effect until July 1, 1949, when it was terminated upon notice given, in accordance with its provisions, by the union. The 1946 contract had contained a closed shop agreement which was not subject to Act 101, since § 5 of the Act specifically provided that the Act should not be applicable to contracts in existence at the time of its passage in 1947.

After the notice of termination was given by the union in May, 1949, the parties began negotiations for a new contract. During the course of the negotiations appellee agreed to all the demands of Local No. 700 except those providing for a closed shop and union hiring hall procedure. Appellee refused to sign a contract containing these provisions because such a contract would be in violation of the law of Arkansas and he would thereby subject himself to criminal prosecution.

Section 3 of Act 101 provides: "No person, group of persons, firm, corporation, association, or labor organization shall enter into any contract to exclude from employment, (1) persons who are members of, or affiliated with, a labor union; (2) persons who are not members of, or who fail or refuse to join, or affiliate with, a labor union; and (3) persons who, having joined a labor union, have resigned their membership therein or have been discharged, expelled, or excluded therefrom."

The closed shop provision of the 1946 contract reads as follows: "The employer shall employ only members in good standing of the Union on all electric work." This identical clause was demanded in the proposed 1949 contract. It is now conceded that inclusion of such a provision would have been illegal.

Upon termination of the contract on July 1, 1949, appellee's employees quit their work and none of them worked for him again until about thirty days later, when two men returned to their jobs. Fines were assessed by Local No. 700 against those who returned to work, and they subsequently resigned from the union.

It appears that another electrical contractor in Ft. Smith, D. C. Barnett, was engaged along with appellee in joint negotiations with Local No. 700, and that the same difficulties were being encountered by him in agreeing upon a contract. Although the record is very sketchy on the exact sequence of events after July 1, 1949, it appears that Barnett instituted a suit similar to the one at bar in the Sebastian Chancery Court sometime in early August, 1949; that as a result of a conference between the Special Chancellor (acting in the absence of Judge Wofford) and the parties to that suit, negotiations between the union representatives and Barnett and Taylor were resumed.

During these negotiations, the union offered a contract substantially the same as the earlier one sought, except that all reference to closed shop, union shop, and union hiring hall had been eliminated. Also the proposed contract contained a provision for cancellation *at any time* by either party upon sixty days notice. The contract previously in force had been for a period of one year, renewable automatically from year to year, unless notice of termination was given thirty days prior to its annual expiration date.

Appellee testified that he agreed to accept all the terms of the contract offered if the union would make a contract "on a year's basis". He testified as follows:

"I agreed to it until they told us that they would have to get rid of the men that were working for us. We asked about this sixty day cancellation clause and they said that I'd either have to get rid of my men or they would cancel the contract.

. . . . . . . .

"Q. Did you inquire of the representative of the unions why there was a sixty day cancellation clause in this contract? A. I asked why they wanted it in there and they told me that they would cancel it out if I didn't dispose of these men. Q. What men did they have reference to? A. Two men that went back to work for me after they refused to let them work for me."

Barnett, who was present at the same negotiating sessions testified concerning inclusion of the sixty-day cancellation clause and his refusal to sign a contract containing it:

"Q. Why did you decline to sign it as presented? A. Because during the discussion, they would always refer to it that they would cancel it, depending on our good behavior, and finally Mr. Petty (a union representative) did say that he would cancel it unless we got rid of some of the men that was in bad with the Local.

. . . . . . . .

"Q. How long have you been doing business with Local No. 700 in Fort Smith? A. Oh, about 9 years. Q. During that time, have you ever been offered, or asked to enter into a contract for a period of less than one year? A. No sir."

This testimony was not contradicted by appellants.

When the union insisted upon the sixty-day cancellation clause, and the union representatives told appellee that they would exercise their right to cancel if he did not fire non-union men working for him, he refused to sign the contract and broke off negotiations, according to his testimony.

On August 25, 1949, two members of the union began peacefully picketing appellee's place of business. They

carried a placard bearing these words: "This place is unfair to Electrical Workers Local AFL 700".

The instant suit was filed the same day and a temporary injunction was issued against picketing appellee's place of business or any place where he was doing work. The initial petition was filed only against Self, but by amendment all the officers of Local No. 700 were made parties so there is no issue on appeal as to the parties to this suit.

After hearing the testimony, the Chancellor made permanent the temporary injunction. A written opinion was filed by the Chancellor as a part of the record, and since it clearly states the basis of his action and details testimony pertinent to a decision of this case, we quote rather extensively from this opinion:

"The first question for consideration is whether or not the inclusion of the 60 day cancellation clause had for its objective the imposition of closed shop conditions.

. . . . . . .

"During the course of the hearing, this question was asked Mr. Self, business agent and witness for the defendants, by the Court:

" 'Q. If I understand that provision, and you will correct me if I'm wrong, it may be terminated by either party, by giving sixty days notice? A. Yes sir, that's right. Q. If the plaintiff in this case were to sign that contract with you, and then employed non-union men on the job with your union employees, would you give them notice? A. May I answer this question in full, Your Honor? It will take a little qualification. You know the law at the present time, does not provide that a union man has to work with a non-union man, and if we had such a contract with either one of these employers, and they employed non-union men, and our men left their employ, I don't think there would be any further point in maintaining a contract. Do you? Q. Would you ask your men to leave their employ? A. I wouldn't have to. They are under obligation. Q. You know that would

take place? A. Yes sir. Our people don't work with that kind of people.'

"Mr. Petty, International Vice President of the union testified as follows:

" 'Q. I will ask you—You stated on direct examination that you were still willing to sign a contract with Mr. Barnett and Mr. Taylor? A. That is right. Q. I will ask you if you are willing to sign a contract for one years duration with them. A. I am willing to sign the same contract that we presented to them, dated August 18th. Q. That would be with the 60 day cancellation clause in it? A. That's right. Q. Now, what is the policy of your union and requirements of your constitution and by-laws governing your members with reference to work with non-union men? A. I believe the constitution speaks for itself. Q. Well, you are familiar with it, aren't you? A. Yes. Q. Well, what is the requirement? A. Well, the policy of the I. B. E. W., in the construction branch of our trade, is to work only with union people of our own craft. Q. Do you agree with the statement that Mr. Self made on direct examination with regard to the procedure in the event that a person having a contract with a union employed non-union people? A. I don't know just exactly what you refer to. Q. Mr. Self testified that it would be expected that union members would not work on the same job with non-union members. A. That is right. Q. And if they withdrew from their employment, there would be no reason for further contractual relations with that employer and notice would be given to cancel the contract? A. That's right. Q. And that, as I understand, is the correct policy of the union? A. That is right.'

"The constitution of the International Brotherhood of Electrical Workers was introduced in evidence, and, under its provisions, its members are not permitted to work with non-union employees. Mr. Webb, Interna-

tional Representative of the I. B. E. W., testified to the same effect as that of Mr. Self and Mr. Petty.[1]

"As stated above, the contract offered August 18, 1949, with the mutual 60 day cancellation clause included, was prepared during the recess in the trial of the Barnett case. The evidence shows that no other contract of its kind in this community has been negotiated. The proposed contract, itself, is not illegal. The way in which defendants say they will operate under it is illegal. If plaintiff were to sign that contract, and did not dismiss from his employ the non-union men working for him the first day the members of the union appeared for work, they would quit and either give notice of the termination of the contract at once, or begin picketing plaintiff's place of business because he employed non-union workers, and this litigation would start all over again. It was the object of the defendants, in submitting this contract, to compel plaintiff to operate a closed shop business. He could not afford to sign such a contract, under the laws of the State of Arkansas, because if he permitted union men to work for him, he would have to violate the law and dismiss employees because they were not members of the union. It is an ingenious scheme, but it did not work."

That peaceful picketing for a lawful purpose is protected both by the federal constitution and the law of Arkansas is too well settled to require discussion. See *Local No. 802* v. *Asimos,* 216 Ark. 694, 227 S. W. 2d 154, for a collection and analysis of our own and U. S. Supreme Court decisions on this subject. It is equally well settled that even peaceful picketing for an unlawful objective is not protected by the constitutional guar-

---

[1] On questioning by the Court, Webb gave these answers:

Q. . . . but I am going to ask you the question again, and I think you have already answered it, according to your constitution and by-laws, if Taylor signed this agreement offered on—in August last year and he then continued to have non-union men in his employment—that your union men would not work?

"A. In accordance with their oath of obligation they have taken to become a member of the brotherhood, they couldn't under the constitution of our organization, work with non-union men.

"Q. And you would give the sixty-day notice?

"A. That is absolutely right."

antee of the right of free speech. We recognized this in the *Asinos* case, *supra*, where we said at p. 702: "On the authority of these Federal cases the injunction in the case at bar could be sustained in some form, if the appellees had shown that the Union was picketing the Jefferson Coffee Shop in an effort to compel the execution of a 'closed-shop' contract." See, also, *Giboney* v. *Empire Storage & Ice Company,* 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834; *Union Local 262* v. *Gazzam,* 339 U. S. 532, 70 S. Ct. 784; *Union Local 309* v. *Hanke,* 339 U. S. 470, 70 S. Ct. 773; *Amalgamated Meat Cutters* v. *Green,* 119 Colo. 92, 200 Pac. 2d 924; *Construction and General Labor Union* v. *Stephenson,* (Tex.) 225 S. W. 2d 958; *Local Union No. 519* v. *Robertson,* (Fla.) 44 So. 2d 899.

Appellants argue that since there is no mention of a closed shop in the proposed contract of August 18, 1949, and appellee refused to sign this contract, they have a constitutional right to picket his business in an effort to force him to accept this contract. They further argue that no man can be forced to work with non-union men, and if for any reason they want to cease their employment they have a right to do so. This latter contention is patently true, but it still begs the question whether they have a right to picket to obtain a contract legal on its face, but which in the circumstances of this case is obviously designed to achieve indirectly a result which the law says is illegal.

We do not find that this question has been presented to any court before. The National Labor Relations Board, however, has considered a closely analogous situation where the International Typographical Union was attempting to avoid the anti-closed shop provisions of the National Labor-Management Relations Act of 1947. *In the Matter of Chicago Typographical Union No. 16,* 86 Decisions and Orders of the N. L. R. B. 1041. There the NLRB held that union insistence upon a sixty-day cancellation clause in any collective bargaining contract with the publishers amounted to bad faith bargaining and was an unfair labor practice under the federal act. In so holding the NLRB said: ". . . the primary

objective of collective bargaining is to stabilize labor relations for periods of reasonable duration. To this end the parties had, before 1947, traditionally bargained for and executed contracts for a fixed duration of 1 year. The Respondents' unwillingness to consider the traditional term, evidenced by their refusal to bind themselves contractually for more than 60 days, raises in and of itself a presumption that the Respondents were not bargaining in good faith. The record shows no lawful or reasonable economic justification for such a refusal. Indeed, as we have already noted, it establishes that the 60-day cancellation clause was deliberately designed, and was adamantly insisted upon, to effect the exclusion of nonunion men, squarely in conflict with the provisions of the amended Act. . . . under this arrangement the Respondents intended to place themselves in a position whereby they could with contractual impunity call a strike, ostensibly with regard to economic matters otherwise settled in the cancellable agreement, in order to force the Employer noncontractually to maintain closed-shop conditions.''

We think the same analysis fits exactly the situation presented in the instant case. The undisputed proof amply supports the Chancellor's finding that the only purpose of the picketing was to force appellee to continue a closed shop either contractually or non-contractually as a matter of economic self-preservation.

In *Giboney* v. *Empire Storage & Ice Co., supra,* the U. S. Supreme Court sustained an injunction against peaceful picketing where the Missouri courts had found that the sole purpose of the picketing was to induce Empire to agree not to sell ice to non-union peddlers—an illegal objective under Missouri law. While in that case, the illegal purpose was admitted, and here it is denied, it is not necessary that one concede in so many words that he is violating the law before he is accountable for his actions, if the illegal nature of his acts clearly appears from all the facts and circumstances. We think the principles announced in the *Giboney* case are applicable here:

"It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgment of free speech because the picketers were attempting peacefully to publicize truthful facts about a labor dispute. See *Thornhill* v. *Alabama,* 310 U. S. 88, 102, 60 S. Ct. 736, 84 L. Ed. 1093, and *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 807, note 12, 65 S. Ct. 1533, 89 L. Ed. 1939. But the record here does not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings, and the argument of the appellants, the sole immediate object of the publicizing adjacent to the permises of Empire, as well as the other activities of the appellants and their allies, was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities—their powerful transportation combination, their patrolling, their formation of a picket line warning union men not to cross at peril of their union membership, their publicizing—constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. In this situation, the injunction did no more than enjoin an offense against Missouri law, a felony." (p. 497-98).

"While the State of Missouri is not a party in this case, it is plain that the basic issue is whether Missouri or a labor union has paramount constitutional power to regulate and govern the manner in which certain trade practices shall be carried on in Kansas City, Missouri. Missouri has by statute regulated trade one way. The appellant union members have adopted a program to regulate it another way. The state has provided for enforcement of its statutory rule by imposing civil and criminal sanctions. The union has provided for enforcement of its rule by sanctions against union members who cross picket lines. . . . We hold that the state's power to govern in this field is paramount . . .". (p. 504).

To use a phrase of Mr. Justice FRANKFURTER in the *Hanke* case, *supra,* we do not consider the proposed union contract "as an independent collocation of words" and determine the objective of the picketing from that alone.

The contract itself; the circumstances of its proposal; the constitution of the international union (which forbids union members from working on the job with non-union men) as made in effect a part of the contract; the testimony of union representatives that their members would not work under the contract if non-union members were employed—all of these things must be considered in deciding whether the finding of the Chancellor as to the purpose of the picketing is supported by the evidence. Unless we blind ourselves to reality it is apparent that a closed shop is the union's objective in picketing.

We hold that the injunction was properly granted. To hold otherwise would subject appellee to endless picketing which could only be terminated by granting a closed shop by practice, if not by contract. Suppose, for example, appellee signed the demanded contract, and did not discharge his non-union employees. The union would, as the testimony shows, immediately give the sixty-day notice and terminate the contract. They would then begin picketing appellee's business as unfair. Why? Because he insisted upon obeying the laws of Arkansas instead of abiding by the policy of the international union. Of course, some pretext might be given as a claimed legitimate grievance, but the real union purpose would be to force a closed shop. The record could be no clearer after a trial period under the sixty-day contract than it is in the instant case.

Certainly our decision is not to be taken as holding that a collective bargaining contract must be effective for any particular length of time. As stated in the trial Examiner's Intermediate Report in the *Chicago Typographical Union* case, *supra* (at p. 1062): "The question of the length of a contract term is ordinarily one for negotiation between the parties. A refusal to agree to a term of 1 year, or of any other particular duration, does not *per se* constitute a refusal to bargain. . . . In the instant case no special circumstances were advanced by the Union for departing from the traditional practice of signing contracts for a fixed duration term of a year, other than a desire to protect the 'rights' of its members

not to work with nonunion men, or on nonunion goods, or where its jurisdiction was interfered with." Insistence upon the sixty-day cancellation clause in the circumstances of this· case is simply one element in the proof of Local No. 700's illegal purpose.

One final point must be mentioned. Appellants argue that the court went too far in making the injunction "permanent". In answer to a similar contention in *Milk Wagon Drivers Union* v. *Meadowmoor Co.*, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, the U. S. Supreme Court said: (at p. 298) "The injunction which we sustain is 'permanent' only for the temporary period for which it may last. . . . Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted." The injunction does not prevent appellants from bargaining in· good faith for a legal contract. If legitimate differences arise not connected with the closed shop demand, which would warrant peaceful picketing, they may apply to the Chancery Court for appropriate modification of the injunction. If such modification is erroneously denied, an appeal always lies to this court.

Affirmed.

LEFLAR, J. (dissenting). The facts of this case have been fully set out in the majority opinion, as have also the relevant rules of law. They will be restated here only to the extent necessary to present my views.

Peaceful picketing is lawful in Arkansas, at least when used as a means for publicizing efforts to achieve lawful ends against the party picketed. *Local No. 802* v. *Asimos,* 216 Ark. 694, 227 S. W. 2d 154. The communication of information by such picketing is a part of the freedom of speech which is guaranteed by the Constitution. *Thornhill* v. *Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 460. But picketing may be forbidden when it is used to achieve unlawful ends. *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834; *Building Service Union* v. *Gazzam,* 339 U. S. 532, 70 S. Ct. 784. A collective bargaining contract call-

ing for a closed shop is unlawful in Arkansas. Constitution of Arkansas, Amendment 34; Ark. Stats., §§ 81-201 to 81-205. There is no law in Arkansas, however, that requires contracts of employment to be entered into for any specific period of time, such as one year, and it is altogether lawful for employers and employees to contract voluntarily for a period of employment covering sixty days only, or more, or less. We have no law that requires a workman to promise by contract that he will work for more than sixty days if he does not choose to do so.

Furthermore, the National Labor Relations Act does not apply to intrastate employment. There is no contention that it applies in the present case. That federal enactment creates the concept of "unfair labor practices" which, according to the opinion of the National Labor Relations Board quoted in the majority opinion herein, (86 N. L. R. B. Reports 1041) includes conduct similar to that involved in the present case. As to that it suffices to say that no similar law has been enacted in Arkansas to create the statutory concept of "unfair labor practices," and there is no common law rule in Arkansas making it unlawful for laborers to seek a sixty-day contract rather than a one year contract of employment, regardless of their reasons.

The contract sought by defendants here would obligate them to work for at least sixty days in an open shop. The contract would not automatically terminate at the end of sixty days, of course, but the reserved right in either party to terminate it by sixty days written notice would produce at least a theoretical possibility that the contract might not last longer than sixty days (though experience shows that many contracts made by skittish and suspicious parties with sixty-day or thirty-day termination clauses actually last for years.) I therefore refer to it as a sixty-day contract merely. Our Amendment 34, and its enabling act, do not say that employees must contract to work in an open shop for at least a year at a time. A contract for sixty days of open

shop employment is a completely valid contract under our law.

The evidence quoted in the majority opinion indicates that if this sixty-day contract is signed the defendants will not work *more* than sixty days under it. That would be their privilege under the contract. It is also their privilege under the law of Arkansas.

If the contract and the defendants' employment under it are terminated at the end of sixty days a new problem will obviously have arisen. It may be assumed that the employer will offer a new contract containing the same open shop provisions and the same sixty-day notice clause. If the defendants accept it, work will continue without interruption. If they reject it on the ground that the wage scale provided by it is too low they will be within their rights and no law will be violated. If they reject it because of the open shop provisions, and insist upon closed shop provisions, they will be asking for an illegal contract, and picketing to achieve it may be lawfully enjoined. *Giboney* v. *Empire Storage Co., supra; Building Service Union* v. *Gazzam, supra; Local No. 802* v. *Asimos, supra.* At that stage, but not until that stage, the picketing will be used to achieve unlawful ends.

It may be said that this merely postpones an inevitable outcome, that by the evidence the unlawful end will surely be sought sixty days hence in any event, and that we might as well assume its inevitability and enjoin it now. The difficulty with this is that the **assumedly** inevitable outcome is not what we are enjoining now. What we are enjoining now is something else, something that is lawful.

Apart from that, we do not really know that an effort to secure an unlawful closed shop contract will surely be the inevitable outcome of a sixty-day contract executed now. There is testimony from which it is inferred that this effort will ensue. But minds and motives change as time passes. New bargaining techniques may be developed, new incentives may arise. It is at least

conceivable that the problem may not exist at all after the men have been back at work for sixty days.

The action now being taken by the majority of this Court appears to me to be a serious and a dangerous one. It is not limited in its impact or effect to labor union cases. It may apply in any case where any group, or any individual, seeks to engage in lawful conduct which, in the minds of some or all, may create a later opportunity for unlawful conduct. It is the motive, the hope, the uncertain expectation that is feared, and because of the fear a lawful act is enjoined. This is too tenuous. It goes a step beyond our past decisions in seeking to control the minds of men by law, in seeking to prevent the peaceful communication of ideas upon a subject of legitimate public interest. I do not want to take that step.