LION OIL COMPANY v. MARSH.

4-9887                                              249 S. W. 2d 569

Opinion delivered June 2, 1952.

Rehearing denied June 30, 1952.

*Davis & Allen,* for appellant.

*Lindsay P. Walden, William E. Rentfro* and *John M. Shackleford,* for appellee.

WARD, J. This litigation arises out of a labor dispute between appellant and its employees, and involves the right of said employees to picket while a contract of employment was still in full force and effect. The litigation arose and came to this court in the manner set out below.

Appellant, a corporation organized under the laws of Delaware and authorized to do business in Arkansas,

is engaged, along with other extensive business activities, in operating a chemical plant in Union County, Arkansas, for the manufacture of sulphate ammonia, prilled ammonium nitrate solutions and other chemical compounds. It appears that these substances are used extensively in the manufacture of fertilizer. One day of normal operations will produce approximately 350 tons of sulphate ammonia, 400 tons of prilled ammonium nitrate, 345 tons of ammonium nitrate solutions and 120 tons of anhydrous ammonia.

There are about 600 employees at said plant and a large number of them are members of the Oil Workers International Union, C. I. O., which will hereafter be referred to as the Union. Appellees are four union-member employees who were made defendants in this suit as class parties defendant representing all the union-member employees. On June 27th, 1947, the Union was certified by the National Labor Relations Board as the agent for all employees of appellant employed by it from time to time in the operation of its plant for collective bargaining.

On April 29th, 1950, appellant entered into a written contract or agreement with the Union. This writing, which covers more than 50 pages in the transcript, sets out in detail regulations regarding rights to arbitrate, classification changes, hours of work, wages, overtime, holiday pay, vacations, seniority, reduction of forces, discharges, physical examinations, union dues, safety hazards, sickness, accidents and other items. The preamble states that it is an "Agreement between the Lion Oil Company . . . and Oil Workers International Union, C. I. O. . . ." Article I provides:

*"Term of Agreement*

"This agreement shall remain in full force and effect for the period beginning October 23, 1950, and ending October 23, 1951, and thereafter until canceled in the manner hereinafter in this Article provided.

"This agreement may be canceled and terminated by the Company or the Union as of a date subsequent

to October 23, 1951, by compliance with the following procedure:

"(a) If either party to this agreement desires to amend the terms of this agreement, it shall notify the other party in writing of its desire to that effect, by registered mail. No such notice shall be given prior to August 24, 1951. Within the period of 60 days, immediately following the date of receipt of said notice by the party to which notice is so delivered, the Company and the Union shall attempt to agree as to the desired amendments to this agreement.

"(b) If an agreement with respect to amendment of this agreement has not been reached within the 60-day period mentioned in the sub-section immediately preceding, either party may terminate this agreement thereafter upon not less than sixty days' written notice to the other. Any such notice of termination shall state the date upon which the termination of this agreement shall be effective."

Some time prior to October 23rd, 1951, appellees, being dissatisfied with the wage scale in effect, demanded of appellant an hourly wage increase for each employee equal to 25 cents plus a differential of six cents for shift workers working on the evening shift and 12 cents for a shift worker working on the midnight shift, and on August 24th, 1951, pursuant to the provisions of Article I copied above, notified appellant in writing [by registered mail] of its desire to amend the terms of the agreement. No agreement was reached and on April 30th, 1952, the employees began a strike at the plant and established picket lines at all entrances.

On May 1st, 1952, appellant filed a suit in the Union Chancery Court against appellees, asking a temporary restraining order enjoining appellees from picketing. On the following day the chancellor denied appellant's petition for a temporary restraining order and appellant prosecutes this appeal.

In effect this case is before us as if it were an appeal from an order of the lower court sustaining a demurrer

to the complaint, because the transcript contains only the verified complaint to which is attached the agreement referred to above and the order of the chancellor. No objection is raised by appellees that the complaint was not properly presented to or acted upon by the chancellor, or that this appeal has not been properly taken.

The complaint alleges the facts set forth heretofore and also alleges that the calling of the strike and establishing picket lines constitute a breach of said contract or agreement; that the picket lines have caused approximately 300 employees to refuse to work; that it has already been damaged in excess of $50,000, which damage is irreparable and will increase in amount so long as the strike continues; that it will lose the good will of its customers who are located in this and other states; and that it has no adequate remedy at law. All the allegations of the complaint, other than conclusions and declarations of law, must be considered by us as setting forth the proven facts. The complaint has woven into it certain allegations tending to show a conspiracy on the part of the Union representing appellees and many other unions representing employees in a large number of similar plants throughout the United States in violation of the monopoly statutes of this state, but this phase of the case will not be considered on this appeal since our decision makes it unnecessary.

It is our conclusion that the written agreement entered into by appellant and the Union is legally binding upon appellant and its employees in so far as it is enforceable under the laws of this state, that the agreement was in full force and effect when appellees called a strike on the date mentioned above, that appellees have no right to picket appellant's plant and thereby prevent its full operations for the purpose of imposing their demands for increased wages, and that the chancellor should have issued a temporary order restraining those employees who were engaged in picketing. We point out that we are not holding that appellees, under the facts and circumstances of this case, could be restrained from striking,

as distinguished from picketing. There is nothing in the agreement, and there could be nothing in such an agreement, which could force the employees to work unless they want to do so.

The conclusions announced above have been arrived at after much deliberation and after a thorough consideration of the serious arguments to the contrary which have been ably presented by appellees and which we now examine.

1. *Agreement in Force.* It can hardly be disputed that the agreement referred to above was in full force when the strike and picketing occurred, as a casual reading of Article I set out above will show. Appellees could have easily effected a legal cancellation of the contract by giving the notice provided for therein, but the record does not show this notice was given. Since the terms of the agreement provided for an automatic continuation after October 23rd, 1951, the burden was on appellees to show they had terminated the agreement by giving the required notice, but this burden has not been met. We make it clear that if we did not hold the agreement was in force at the time the picket lines were established this case would assume an entirely different aspect.

2. *Jurisdiction of state courts.* It is urged that state courts have no jurisdiction in this matter because the Federal Labor-Management Act, 1947 [commonly called the Taft-Hartley Act] has placed exclusive jurisdiction in the federal courts and in the National Labor Relations Board. This contention applies only to cases involving interstate commerce, as this one does. Appellees quote excerpts from the last mentioned statute and from federal decisions to sustain their point, but we find nothing in the Taft-Hartley Act or the decisions that denies the right of jurisdiction which we here assume. The case of *Bethlehem Steel* v. *New York Labor Board,* 330 U. S. 767, 67 S. Ct. 1026, 91 L. Ed. 1234, appears to hold that when the Federal administration has made comprehensive regulations governing the subject matter of the act then the states have no right to pass statutory regulations regarding the same subject matter, but this

case presents no question of state legislation or regulation. To the same effect is the holding in the case of *United Automobile Workers* v. *O'Brien*, 339 U. S. 454, 70 S. Ct. 781, 94 L. Ed. 978, and the case of *Amalgamated Association* v. *Wisconsin Board*, 340 U. S. 383, 71 S. Ct. 359, 95 L. Ed. 364. On the other hand we find that the Federal courts have expressly held that state courts do have jurisdiction in similar situations. The case of *United Electrical Radio & Machine Workers of America (C. I. O.) et al.* v. *Westinghouse Electric Corporation*, 65 F. Supp. 420, involved a dispute arising under the Norris-LaGuardia Act and the National Labor Relations Act. These acts, of course, have been amended by the Taft-Hartley Act since this case was decided, but the language and reasoning used are persuasive in this instance. The question of state jurisdiction was raised and, referring to the statutes first above mentioned, the court said:

"However, there is nothing in either statute that prohibits the institution, by either party involved in a controversy of this character, of proceedings in a state court, or that places exclusive jurisdiction in the federal courts."

In the case of *Southern Bus Lines, Inc.* v. *Amalgamated Ass'n of Street Electric Railway & Motor Coach Employees of America, et al.*, 205 Miss. 354, 38 So. 2d 765, decided some two years after the Taft-Hartley Act became effective, the court reiterated and approved the finding in the *United Electrical* case quoted above. Apparently those contesting the right of state jurisdiction did not invoke the Taft-Hartley Act, and we think for good reason. From our understanding of the Taft-Hartley Act it does not deal with the question of jurisdiction, but left that question exactly as it was under the two former acts. Moreover it might be pointed out that the Taft-Hartley Act deals only with strikes and makes no mention of picketing. This court has heretofore assumed jurisdiction as will be seen in the cases of *Boyd* v. *Dodge, Chancellor*, 217 Ark. 919, 234 S. W. 2d 204, and *Self* v. *Taylor*, 217 Ark. 953, 235 S. W. 2d 45. We recognize that these

cases involve questions of breaches of the peace and violations of an Arkansas Constitutional Amendment and cannot be conclusive of the issue here presented, but they are cited as persuasive of the fact that this court has not considered the Taft-Hartley Act [or any other federal act] as having clothed the federal courts with exclusive jurisdiction.

3. *Unlawful purpose.* This court held in the case of *Self* v. *Taylor, supra,* that employees did not have the right to picket in an effort to compel the employer to agree to a closed shop. The reason assigned was that the pressure so exerted was to coerce the employer to contract in violation of Amendment No. 34 to the state constitution commonly called the Freedom to Work Amendment. Appellees here find no fault with that decision, but insist that it has no application because picketing in the instant case is not done for an unlawful purpose. In other words appellees are asking us to make a distinction between picketing to force a breach of a statutory law and picketing to force a breach of a lawful contract. We think it can hardly be insisted, however, that this court in applying the rule of "unlawful purpose" to the facts in the *Self* case meant to limit the phrase to that set of facts alone.

We agree with appellees that the word "unlawful" in its ordinary connotation applies to the commission of an act prohibited by law, but we cannot agree that it is entirely proper to say that it is lawful in this state to breach a contract. Here economic pressure is being exerted [resulting in substantial financial losses to appellant] to acquire rights [higher wages] which under the contract of employment appellees were not entitled to receive; but this notwithstanding the fact the method by which the demands could have been lawfully asserted was clearly set out in the written agreement for the protection of all parties. As heretofore pointed out, courts will not, in these circumstances, enjoin workers from striking, even though such action may violate the terms of the contract. But when a strike, in violation of a contract freely and fairly entered into, is accompanied

by picketing it deprives the employer of substantial rights, and, although it may be said such action is not for the purpose of forcing the violation of any statutory law, its only purpose can be to modify or nullify that contract. Lawful contracts relating to business transactions are essential to the welfare of all people and all classes and the courts always have and always must hold them inviolate. This conception of contractual relationships is the bulwark of safety and prosperity to employer and employee alike.

In this connection we could not better express our ideas than they are expressed in the case of *Greater City Master Plumbers Ass'n, Inc.,* v. *Kahme et al.,* 6 N. Y. S. 2d 589. The same issue and very similar facts were involved there as here. The court in arriving at the same conclusion we have expressed used, in part, the following language:

"The making of a collective labor agreement has been one of the most important goals of union labor policy. It is a policy that the court believes works as much to the advantage of the employers in stabilizing labor conditions as to the employee in making for a better standard of living, and as such is entitled to the full protection of our courts. *Murphy* v. *Ralph,* 165 Misc. 335, 299 N. Y. S. 270. The parties to a collective bargaining agreement entitled to such full protection come before the court on an equal basis. 'It is elementary, and yet sometimes requires emphasis, that the door of a court of equity is open to employer and employee alike. It is no respecter of persons—it is keen to protect the legal rights of all.' *Schlesinger* v. *Quinto,* 117 Misc. 735, at page 745, 192 N. Y. S. 564, at page 569. The compliance of the respective parties to a collective bargaining agreement with the terms of the agreement entered into by them will receive the court's approbation, their violations and derelictions will receive the court's condemnation. Contracts are made to be enforced, not to be broken at the whim or caprice of a party thereto. Mere dissatisfaction with a term of an agreement willingly entered into is insufficient reason for the violation of

that term of the agreement. The fact that one of the parties to the agreement is a labor union does not change these legal principles. Labor, through trade unions, has for years fought an uphill battle for recognition before the courts and equality in dealing with employers. Labor, first of all, should be jealous of the rights it has achieved and zealously guard them lest unbridled, uncontrolled and/or unwise conduct on the part of some of its members may lose for it the very thing for which men even have sacrificed their lives to achieve. Labor can only achieve further progress by being cognizant of the fact that it is an integral part of an orderly society which is governed by the processes of law and order. Labor must and should recognize these processes. A labor philosophy based upon the theory that might is right, in disregard of law and order, is an unfortunate philosophy of regression whose sole consequences can be disorder, class hatred and intolerance,''

These considerations drive us to the conclusion that the purpose of appellees, evidence by establishing picket lines and thereby causing great financial loss to appellant, was to escape the obligations of a legal contract which were still in force. This mode of conduct has never received approbation in a court of chancery. It cannot reasonably be urged that in so holding we are taking away from appellees any rights they have under any provisions of the federal constitution or statutes, because they could, under the terms of the agreement they are attempting to alter, have given appellant 60 days notice and thereby placed themselves in position to picket with full immunity. Moreover it appears unreasonable for appellees to contend the right they here insist on is guaranteed under the Taft-Hartley Act, because the provisions of that Act are just to the contrary. Section 8 (d) (4) provides that where there is a collective bargaining contract and the employer and employees are bargaining for a readjustment the employees shall not resort to a strike or the employer to a lockout until the expiration date of the contract.

4. *Right of free speech.* It is contended finally that to enjoin appellees from picketing in this instance would

be to deny them the right of free speech guaranteed by the 14th amendment to the federal constitution. It is true that our courts have held that picketing is a form of speech and comes within the purview of the constitution, but the answer is that appellees deprived themselves of this right [for a period of 60 days only] by entering into the agreement. The question of whether appellees could by agreement deprive themselves indefinitely of this right is not here presented. We see no logical reason why they could not by agreement deprive themselves of this right for a short period, and we know of no decision so holding. In fact we understand it is conceded by appellees that if the agreement had contained a clause expressly binding appellees not to strike [during the life of the contract] it would have been binding. By so conceding they must also concede that the right of free speech or the right to strike for a limited time can be bargained away without doing any violence to the 14th amendment.

For the reasons given above the cause is reversed and remanded with directions to the chancellor to issue a temporary injunction as prayed for in the complaint.

Ed. F. McFaddin, Justice (dissenting). This is an appeal by Lion Oil Company (hereinafter called "Lion") from the refusal of the Chancellor to grant a temporary injunction. On May 1, 1952, Lion filed suit against some of its employees, seeking to enjoin them from picketing at the Lion plant. Only a regular summons was served on each defendant, notifying him to answer in 20 days. On May 2nd—one day after filing the suit, and without any notice to defendants of such application—Lion applied to the Chancery Judge for a temporary restraining order. The Chancellor refused to issue such temporary injunction, and Lion has appealed from such refusal.

In *Riggs* v. *Hill*, 201 Ark. 206, 144 S. W. 2d 26, we quoted with approval from 28 Am. Jur. 500, the rule definitely recognized in this State:

" 'The granting or refusing of injunctive relief rests within the judicial discretion of the trial court, and its action in the matter will be sustained on review by an

appellate court, where the power has not been abused . . ."
Applying the foregoing rule to the case at bar, it is clear
that, on this appeal, the burden is on Lion to show that
the Chancellor abused his discretion in refusing to grant
the temporary restraining order on May 2nd. I most sin-
cerely insist that this burden has not been sustained by
Lion, because the Chancellor could have refused the tem-
porary injunction for any one of several reasons,[1] each
of which was well within the range of discretion allowed
a Chancellor in such a case. One such good reason for
refusing the temporary injunction is the doubtful right
of the plaintiff to the prayed relief; and I propose to show
this doubtful right on each of the grounds alleged by Lion
for relief.

I. *It is Extremely Doubtful that the Picketing Was
for an "Unlawful Purpose"*. The complaint alleged that
the strike was "for an unlawful purpose" because it was
in breach of a contract. In claiming that the strike was
for an "unlawful purpose", Lion insists that the injunc-
tion against picketing should have been issued under the
authority of *Self* v. *Taylor*, 217 Ark. 953, 235 S. W. 2d 45.
But that case affords Lion no support. In *Self* v. *Taylor*,
*supra*, it was pointed out that the workers were picketing
for a closed shop, and that a closed shop was made *unlaw-
ful* by Amendment 34 to the Arkansas Constitution, and
Act 101 of the 1947 Arkansas Legislature. *Self* v. *Taylor*,
*supra*, cited and relied on *Local* v. *Asimos*, 216 Ark. 694,
227 S. W. 2d 154; and in the Asimos case, the State and
Federal holdings were catalogued and discussed in detail,
and from them we deduced the conclusion that picketing
can be enjoined only (1) when such picketing has resulted
in violence, or (2nd) when the picketing is for an unlawful
purpose. There is no evidence of violence in the case at

---

[1] I forego any discussion of the right of the Chancellor to refuse
a temporary restraining order because of lack of notice to defendants,
(See § 32-201 *et seq.* Ark. Stats.), since the decree in the case at bar
recites "that the allegations of the complaint of the plaintiff and the
fact stated in the affidavits in support of the application for a tem-
porary restraining order hereinbefore mentioned, do not state facts
sufficient to entitle the plaintiff to a temporary restraining order as
prayed in the complaint". This recital in the decree, together with
statement of appellant's counsel in oral arguments in this Court, estab-
lish that the Chancellor did not base his refusal to grant the temporary
injunction on any lack of notice.

bar, so that phase of the law passes out of consideration. Lion claims that the strike was for an "unlawful purpose"; but in so claiming, I insist that Lion mistakes "unlawful" for "wrongful". It may be morally "wrongful" for the union to strike during the life of its contract, but it is not "unlawful" to strike in violation of a contract. By this statement, I am not saying that the strike was in violation of the contract. I am merely assuming such fact for the purpose of argument.

"Unlawful" means "in violation of law". In *State v. Bulot*, 175 La. 21, 142 So. 787, the Supreme Court of Louisiana said that the term "unlawful" means "that which is not lawful, or that which is contrary to some express provision of the law", and that "unlawful purpose" means for the purpose of doing something that is prohibited by law. I realize that the word "unlawful" may sometimes refer to mere civil violations, as distinct from criminal violations;[2] but the general meaning of "unlawful" is "violation of law".[3] Certainly that is the meaning of the words "unlawful purpose" in connection with labor disturbances. In the case of *Cole v. State*, 214 Ark. 387, 216 S. W. 2d 402,[4] we discussed the words "unlawful assemblage" in connection with our Freedom to Work statute; and we there committed this Court to the view that an *unlawful assemblage* was one for the accomplishing of *an act forbidden by law*. That case and its reasoning are clearly against the majority holding in the case at bar. There is no law that adjudges a fine or other criminal penalty against a person who violates a contract. All that the defendants have done in this case is to violate a contract, and such is not *unlawful* within the purview of our labor laws. So I insist that an injunction against picketing should not issue in this case, because the purpose of picketing[5]—while wrongful—was not unlawful.

---

[2] See 66 C. J. 35.

[3] See *Kelly* v. *Worcester*, 97 Mass. 284.

[4] This case was affirmed by the United States Supreme Court in a *unanimous* opinion. See 338 U. S. 345, 70 S. Ct. 172, and 94 L. Ed. 155.

[5] For Annotations on the validity of statutes and ordinances forbidding picketing, see 35 A. L. R. 1200, 108 A. L. R. 1119, 122 A. L. R. 1043, 125 A. L. R. 963, and 130 A. L. R. 1303.

II. *It is Extremely Doubtful Whether Lion is Entitled to Claim that There was a Monopoly.* Lion alleges that the defendants, along with other workers throughout the country, have entered into a conspiracy and a monopoly, in that they have staged a simultaneous nationwide strike. Let us assume every one of the charges to be true, yet I can find no case in this or any other court, which applies the anti-trust laws of the United States, or the monopoly laws of this State, to workers who picket. Let it be remembered that this is merely an effort to enjoin *picketing,* and if they have engaged in a nationwide strike, still I can find no case which holds that such act would justify an injunction against *picketing.* Counsel for Lion, with becoming candor, admit that they have been unable to find any such case. In view of this situation, I maintain that it is extremely doubtful whether Lion is entitled to any relief on its claim of a monopoly.

*Conclusion.* Therefore—since (a) it is extremely doubtful that the purpose of the strike was ''unlawful'', and since (b) it is extremely doubtful whether the anti-trust laws and the monopoly laws have any application in this case—I insist that the Chancellor was well within his discretion in refusing to grant a temporary injunction. In 28 Am. Jur. 208, the rule is stated:

''A preliminary injunction will not ordinarily be granted if the parties are in dispute concerning their legal rights, until such rights are established, especially if the legal and equitable claims asserted raise questions of a doubtful or unsettled character.''

It is only when the plaintiff is clearly entitled to the relief sought that a temporary injunction—at most a provisional writ—should be granted. Here we have a case where Lion's right to the relief is extremely doubtful. Certainly, therefore, the Chancellor did not abuse his discretion in refusing to grant a temporary injunction in advance of the joining of issues.

For these reasons, I respectfully dissent from the majority opinion, which holds that the Chancellor has abused his discretion in refusing to grant the injunction. There is no need to discuss the Taft-Hartley Law. Neither

is there any need for me to enter into a discussion of the right of peaceful picketing. All of this is stated in *Local v. Asimos, supra.* The majority, in reversing the Chancellor in the case at bar, is infringing on the right of peaceful picketing. For the reasons herein stated, I respectfully dissent.

GEORGE ROSE SMITH, J., dissenting. The fundamental question in this case is whether the appellees are striking for an unlawful purpose, so that picketing can be enjoined under the doctrine of *Giboney* v. *Empire Storage Co.*, 336 U. S. 490, 93 L. Ed. 834, 69 Sup. Ct. 684. The majority hold that the strike is in breach of the union's contract and is therefore for an unlawful purpose. While I doubt very seriously if a mere breach of a civil contract, compensable in damages, is so unlawful as to bring such conduct within the *Giboney* ruling, a simpler answer is that in this case there has been no breach of contract.

By implication the majority say that the collective bargaining agreement between the company and the union is a contract of employment; but of course it is not. Contracts of employment arise individually, whenever the company employs a person to work for it. The collective bargaining agreement simply provides the various conditions that will prevail while those employees represented by the union are working for the company under their own separate contracts of employment. As the court said in *J. I. Case Co.* v. *N. L. R. B.*, 321 U. S. 332, 88 L. Ed. 762, 64 Sup. Ct. 576: "Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone." To the same effect is *Division No. 1344 of Amalgamated Ass'n* v. *Tampa Elec. Co.*, (Fla.) 47 S. 2d 13.

By the contract before us the company and the union agreed upon the terms that were to govern working conditions from October 23, 1950, until October 23, 1951. They further agreed that no modification of these terms would

be sought during that year, as the 60-day notice of the desire to amend the contract could not be given before August 24, 1951—exactly 60 days before the end of the first year. Thus the employer and the employees alike gained by the contract the assurance of uninterrupted work for one year. Both parties abided by the contract during its primary term.

But on and after August 24, 1951, either side was free to give 60 days notice of its desire to change the terms of the collective bargaining agreement. During that 60 days the parties were to attempt to arrive at a new contract by peaceful negotiations. This provision of the contract was evidently intended to supply the 60-day period of negotiations that is required by the Taft-Hartley Law. 29 U. S. C. A., § 158. But it is significant that by this contract the employees did not relinquish their right to strike after the expiration of the period of negotiations. See *N. L. R. B.* v. *Columbian Enameling, Etc., Co.*, 7th Cir., 96 F. 2d 948; *Wilson & Co., Inc.*, 89 N. L. R. B. No. 32. After negotiating for 60 days the employees are just as free to go on strike as the company is to close the plant.

The majority seem to rely upon the provision that requires an additional 60-day notice as a condition to terminating the contract altogether. There is certainly nothing in this clause that forbids a strike during the second 60 days, nor does the Taft-Hartley Law require such a protracted cooling-off period. The purpose of this clause is to enable the parties to cancel the contract in its entirety. As long as the collective bargaining agreement is in force the company is bound to pay the agreed wages to all its employees, whether members of the union or not. If the company should desire to reduce its wage scale and be unable to negotiate a contract to that effect, then it may terminate the contract after 60 days notice and be free to employ other workmen at whatever wages they are willing to accept. But, since the 60 days of negotiations required by the Taft-Hartley Law must by this contract have already taken place before the notice of termination can be given, it was evidently the intention

of the parties to leave the union legally free to call a strike upon receipt of the notice of termination. In this way the union is able to bring economic pressure upon the company for 60 days, during which the employer cannot replace the striking employees with cheaper labor.

All these considerations are ignored by the majority, who content themselves with the blunt assertion that a strike during the existence of the contract is unlawful. There would, it is true, be at least a breach of contract if this were a contract of employment or if it contained a clause giving up the right to strike during the existence of the agreement. But the majority do not point to any language of the contract to indicate that either of these conditions is present. We certainly know that strikes during the continued existence of a collective bargaining agreement are by no means uncommon; it would be impossible to negotiate a contract of any duration unless there were provisions for further negotiations during its term. I do not find a syllable in this contract that tends to show that this strike is even in breach of the agreement, much less for an unlawful purpose.

MILLWEE, J., joins in this dissent.