INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION No. 295 v. BROADMOOR BUILDERS, INC.

5-710                                              280 S. W. 2d 898

Opinion delivered June 27, 1955.

*O. D. Longstreth, Jr., Dave E. Witt* and *Joseph Brooks,* for appellant.

*Wright, Harrison, Lindsey & Upton,* for appellee.

ED. F. McFADDIN, Justice. The question here presented is the legality of the picketing in which the appellants were engaged. The Chancery Court found that the picketing was unlawful and issued a permanent injunction. The correctness of that decree is challenged by appellants, who are the International Brotherhood of Electrical Workers Local Union No. 295, and Harold Veazey the business agent of the Local Union.

Broadmoor is a residential addition in the City of Little Rock and contains an area of 190 acres. In the addition there are many streets dedicated and used by the public. The addition is just West of Hayes Street;

there are two streets opening from Hayes Street into Broadmoor; and there are two other streets that lead from Broadmoor to other streets in Little Rock. In short, there are four streets that serve as ways of ingress and egress for Broadmoor Addition, in which are many residences. Fausett and Company are the developers of Broadmoor; and the appellee, Broadmoor Builders, Inc., is the Fausett corporation that serves as a general contractor for the building of the homes in the addition. According to the evidence in the record here, all the electrical work in the construction of the houses in Broadmoor was sub-contracted by Broadmoor to Price-Fewell Company, an electrical firm.

A short time prior to July 9, 1954, Mr. Goode, Secretary of the Building Trades Council of Little Rock, contacted appellee for a conference for the purpose of having the electrical sub-contracts let to union contractors[1] for all electrical work on any houses to be constructed in Broadmoor. Mrs. Fausett, secretary of the appellee company, advised Mr. Goode that the electrical work was already sub-contracted to Price-Fewell Company and that there was nothing that appellee could do about it. Mrs. Fausett testified, without contradiction, that Mr. Goode told her " . . . there are always loopholes where you can break contracts."

The effort of Mr. Goode, as above stated, was the only attempt by any of the unions[2] to obtain sub-contracts for union sub-contractors, to gain recognition as bargaining agents, to obtain a higher wage scale, or to obtain any other benefits from appellee or Price-Fewell Company. Then on July 9, 1954, the appellant Union

---

[1] Mrs. Fausett testified that Mr. Goode's purpose was that he wanted the sub-contracts let to union sub-contractors. This was not denied in any way; and Mr. Veazey said that Mr. Goode reported the conversations with Mrs. Fausett just as Mrs. Fausett had testified.

[2] When appellee obtained injunctions against picketing in the Chancery Court in this case, there were other defendants besides the present appellee: Bricklayers, Masons & Plasterers International Union of America A.F.L., Local No. 1, and Ted Brewer, its business agent, were defendants, as well as United Brotherhood of Carpenters & Joiners of America Local Union No. 690 and Z. W. Burnett, its business agent. The said Local No. 1 and Local No. 690 and the business agent of each have not appealed to this Court from the injunction issued by the Chancery Court.

placed pickets at each of the four entrances to Broadmoor Addition, as hereinbefore described. Each picket carried a sign reading:

"No member of L.U. 295 I.B.E.W. Employed on this Job."

Appellee sought injunction to restrain the picketing, claiming (*inter alia*):

"The union is picketing the plaintiff for the further unlawful purpose of forcing and coercing the plaintiff and its employees in the choice of whether the plaintiff will employ union labor and whether its employees will join the unions. Said purpose is contrary to the law and public policy of Arkansas as expressed by Amendment 34 to the Constitution of Arkansas and Act 101 of 1947.

"In the course of picketing the plaintiff's construction job, the pickets have unlawfully obstructed traffic into and out of Broadmoor Addition. The principal entrances to Broadmoor Addition lie on Hayes Street in Little Rock which is a busy thoroughfare. The unlawful action of the pickets in blocking and obstructing these entrances is causing traffic to stop on Hayes Street an abnormal length of time, obstructs the view and attention of persons entering and leaving Broadmoor Addition, and creates a serious traffic hazard."

Among other defendants, the complaint named the present appellant Union and Harold Veazey, its business agent. These are the only appellants here. A portion of Mr. Veazey's deposition, taken by discovery under Act 335 of 1953, was introduced by appellee; and the remainder of the deposition was introduced by appellants as their only offered evidence.

As aforesaid, the Chancery Court held that the picketing by appellants was unlawful, and issued a permanent injunction; and appellants claim that the decree violates their right of free speech under the 14th Amendment to the United States Constitution; and appellants —in addition to cases from Arkansas and other State

Courts—cite the following cases from the Supreme Court of the United States: *Thornhill* v. *Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *American Federation of Labor* v. *Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; *Bakery & Pastry Drivers* v. *Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816; and *Cafeteria Employees Union* v. *Angelos,* 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126. And to these we add other cases from the Supreme Court of the United States involving questions of picketing, to-wit: *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857; *Milk Wagon Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552; *Carpenters & Joiners Union* v. *Ritter's Cafe,* 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807; *Lincoln Fed. Labor Union* v. *Northwestern Iron & Metal, Co.,* 335 U. S. 525, 93 L. Ed. 212, 69 S. Ct. 251; *American Fed. of Labor* v. *American Sash & Door Co.,* 335 U. S. 538, 93 L. Ed. 222, 69 S. Ct. 258; *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 93 L. Ed. 834, 69 S. Ct. 684; *Hughes* v. *Superior Court,* 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718; *International Brotherhood* v. *Hanke,* 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773; *Building Service Employees* v. *Gazzam,* 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784; *Local Union No. 10.* v. *Graham,* 345 U. S. 192, 97 L. Ed. 946, 73 S. Ct. 585; *Garner* v. *Teamster's Union,* 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161; *Capital Service* v. *N. L. R. B.,* 347 U. S. 501, 98 L. Ed. 887, 74 S. Ct. 699; and *United Const. Workers* v. *Laburnum Const. Corp.,* 347 U. S. 656, 98 L. Ed. 1025, 74 S. Ct. 833.

The appellee urges several contentions, each designed to obtain an affirmance of the Chancery decree which found the picketing to be unlawful. Some of these contentions are:

(1)   The real purpose of the picketing was to force the appellee to breach its contract with Price-Fewell Company; and on this point appellee cites our own cases of *Lion Oil Co.* v. *Marsh,* 220 Ark. 678, 249 S. W. 2d 569; and *Sheet Metal Workers* v. *E. W. Daniels Co.,* 223 Ark. 48, 264 S. W. 2d 597.

(2) The real purpose of the picketing was to force a violation of the Arkansas "Freedom to Work" Constitutional Amendment No. 34, and the Act 101 of 1947, passed in pursuance to said amendment.

(3) That the assigned reason for the picketing was at variance with the rights of picketing; and on this point appellant Veazey testified:

"Q. What was the purpose of the picketing?

"A. To advise our members that we weren't working on the job. We have an awful lot of workers fooling around loose. We did have and have had for the last four months; and they would telephone in; 'Is this or is that job paying the scale?'; and we would have to advise them."

(4) That the business of appellee was not within the economic context of any potential dispute between the Union and the sub-contractor; and on this point appellee gives Mr. Veazey's[3] testimony:

"Q. The picketing was aimed at Broadmoor Builders, Inc.?

"A. Not necessarily. It just happened on that job that the electrical scale was not that which we were receiving from contractors for whom we do work and on this job they were not being paid that rate. . . .

"Q. Had you or your Union ever had any negotiations with Broadmoor Builders, Inc.?

"A. No, our local Union as a rule does not furnish work direct to the building contractor; and Mr. Fausett being a mass builder, in our catalog, he would be a gen-

---

[3] Mr. Veazey also testified:
"Q. Was there anything Broadmoor Builders, Inc., could have done that would have brought about a removal of the Local No. 295 pickets?
"A. Yes, they could have insisted that the prevailing wage scale for electrical workers be paid. . . .
"Q. Assuming that Broadmoor Builders, Inc., did have a contract with Price-Fewell, was there anything that Broadmoor could have done which would have brought about the removal of your pickets?
"A. I don't know. . . ."

eral contractor. Even though he does not do any electrical work, he sub-contracts it out. I couldn't have had any contract with him. . . . We don't do business with general contractors. We work with sub-contractors.''

We find it unnecessary to discuss any of the above listed points, because we rest our opinion on another ground; that is, the picketing was too broad and in too general a locality. It interfered with normal business transportation, entirely disconnected from the purpose or designs of lawful picketing.[4] It was shown that Price-Fewell Company was engaged in doing the electrical work in only six houses in Broadmoor Addition; that at least 75 other houses were under construction in ·the 190-acre area of the Broadmoor Addition; that at these other 75 houses there were no electrical workers and there was no labor dispute or other dispute of any kind; that these other 75 jobs of construction were in need of concrete, lumber, doors, etc.; that, because of appellant's picketing of the four streets leading into Broadmoor, the truck-drivers would not deliver concrete, lumber, doors, etc. to the other 75 jobs entirely distinct and separated from the six jobs on which there were electrical workers; that truck shipments of doors would normally have been delivered direct to some of the other 75 jobs, but, because of the pickets of the appellant over all of the four streets leading into Broadmoor, the truck shipments were left at a storage depot in Little Rock and appellee was forced to have the shipments delivered to the jobs by other truckers who would cross the picket lines of the appellant.

The right to picket under lawful conditions has been recognized in numerous cases by this Court, some of which are: Local Union v. Asimos, 216 Ark. 694, 227 S. W. 2d 154; Boyd v. Dodge, 217 Ark. 919, 234 S. W. 2d 204; and Self v. Taylor, 217 Ark. 953, 235 S. W. 2d 45.

---

[4] In 70 C. J. S. 1049, et seq., picketing is defined as the stationing of men "at or near the plant or job." The basic idea, as reflected by the cases, is that the picketing must be in the immediate vicinity of the place of business of the institution or plant picketed. To the same effect, see 34 Am. Jur. 943.

The Supreme Court of the United States has recognized that the right of picketing has its limitations. In *Giboney* v. *Empire Storage Co. (supra)*, picketing was enjoined where its purpose was to force a violation of the law. In *Hughes* v. *Superior Court (supra)* it was recognized that the picketing of a store to compel the employment of a proportion of Negro clerks was against the public policy of California. In *Hanke* v. *International Brotherhood (supra)* the U. S. Supreme Court declared that the Courts, as well as the Legislature, may declare the public policy of the State.[5]

In the case of *Mo. Pac.* v. *United Brick & Clay Workers Union,* 218 Ark. 707, 238 S. W. 2d 945, we refused to enjoin picketing which prevented the delivery of railroad shipments by a carrier to the affected plant; but at the first session of the Legislature after our opinion, the Arkansas Legislature passed Act 257 of 1953, which declared that picketing was unlawful when it prevented the moving of trains to a plant when the railroad company was not a party to the strike. That enactment of the Legislature as to trains clearly indicates the public policy of Arkansas, which we now declare, as to the delivery of merchandise or other articles to persons or places entirely disconnected from any picketing that might be legal as against the limited person or place to be picketed. Here, truck shipments to 75 jobs of Broadmoor Builders, Inc. were effectively stopped by the presence

[5] In the Hanke case, Mr. Justice FRANKFURTER used this cogent and descriptive language: "Here, as in *Hughes* v. *Superior Court,* 339 U. S. 460, ante, 985, 70 S. Ct. 718, we must start with the fact that while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is 'indeed a hybrid.' Freund, On Understanding the Supreme Court 18 (1949). See also Jaffe, In Defense of the Supreme Court's Picketing Doctrine, 41 Mich. L. Rev. 1037 (1943). The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and 'the power of the State to set the limits of permissible contest open to industrial combatants.' *Thornhill* v. *Ala.,* 310 U. S. 88, 104, 84 L. Ed. 1093, 1103, 60 S. Ct. 736. A State's judgment on striking such a balance is, of course, subject to limitations of the Fourteenth Amendment. Embracing as such a judgment does, however, a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors, such judgment on these matters comes to this Court bearing a weighty title of respect."

of pickets who were concerned with only six jobs of Price-Fewell Company; and it has been recognized in many cases that the respecting of picket lines is prevalent.[6] If the appellant's picket line was aimed at anyone it was directed toward Price-Fewell Company, which had the electrical sub-contract and was working on six electrical construction jobs in Broadmoor. The appellant Union—as testified by Mr. Veazey—had no dispute with the appellee and would not have entered into a contract with the appellee, who is a general contractor. By placing the pickets as they were, appellants effectively stopped the delivery of concrete, doors, lumber, etc., to 75 jobs of appellee's construction, and these jobs were in no way connected with the electrical work then being done by Price-Fewell Company on six other jobs. If appellant could legally picket all the streets leading into Broadmoor because there were six houses under construction therein where there were electrical workers, then, by the same token, the appellant could picket all of the highways leading into Little Rock because Price-Fewell Company had six jobs in the City on which no member of appellant Union was employed, and on which jobs the wages paid were below the Union scale. The picketing by appellant should have been confined to the jobs on which Price-Fewell Company was working—provided the matters between Price-Fewell Company and the Union were at

---

[6] In *Hughes* v. *Superior Court (supra)*, Mr. Justice FRANKFURTER emphasized the force of the picket line, as compared to ordinary dissemination of information by publication in these words: "But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing 'is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' Mr. Justice DOUGLAS, joined by BLACK and MURPHY, JJ., concurring in *Bakery & Pastry D. & H. Local* v. *Wohl*, 315 U. S. 769, 775, 776, 86 L. Ed. 1178, 1183, 1184, 62 S. Ct. 816. Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. See Gregory, Labor and the Law 346-348 (rev. ed. 1949); Teller, Picketing and Free Speech, 56 Harv. L. Rev. 180, 200, 202 (1942); Dodd, Picketing and Free Speech: A Dissent, 56 Harv. L. Rev. 513, 517 (1943); Hellerstein, Picketing Legislation and the Courts, 10 N. C. L. Rev. 158, 186, 187, note 135 (1932).

the picketing stage—and not to the entire addition of 190 acres on which were under construction 75 other houses in no way connected with the kind of work desired to be performed by appellant Union. We therefore conclude that the appellant's picketing is unlawful[7] under the facts in this case; and the decree is affirmed.

[7] We recognize that in *Capital Service* v. *N. L. R. B.*, 347 U. S. 501, 98 L. Ed. 887, 74 S. Ct. 699, and in *Garner* v. *Teamster's Union*, 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161, the Supreme Court of the United States held that in some matters the National Labor Relations Act preempted the field in labor matters and that the State courts were not free to act. Yet, in *United Const. Workers* v. *Laburnum*, 347 U. S. 656, 98 L. Ed. 1025, 74 S. Ct. 833, the United States Supreme Court recognized that actions in regard to labor matters might still be maintained in the State courts in some instances; and we understand the *Laburnum* case as recognizing that *Hughes* v. *Superior Court* and *Henke* v. *International Brotherhood of Teamsters*, still give the State courts the right to determine public policy and to "set the limits of permissible contests open to industrial combatants."