## INTERNATIONAL BROTHERHOOD OF TEAM-
## STERS, ETC. UNION, LOCAL 309, ET AL. *v.* HANKE
## ET AL., DOING BUSINESS AS ATLAS AUTO REBUILD.

NO. 309.

Argued February 9, 1950.—Decided May 8, 1950.

*Samuel B. Bassett* argued the cause and filed briefs for petitioners.

*J. Will Jones* argued the cause for respondents in No. 309. With him on the brief was *Clarence L. Gere.*

*C. M. McCune* argued the cause for respondent in No. 364. With him on the brief was *Austin E. Griffiths.*

*J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn* filed a brief for the American Federation of Labor, as *amicus curiae,* supporting petitioners.

Mr. Justice Frankfurter announced the judgment of the Court and an opinion in which The Chief Justice, Mr. Justice Jackson and Mr. Justice Burton concurred.

These two cases raise the same issues and are therefore disposed of in a single opinion. The question is this: Does the Fourteenth Amendment of the Constitution bar a State from use of the injunction to prohibit the picketing of a business conducted by the owner himself without employees in order to secure compliance by him with a demand to become a union shop?

In No. 309, respondents A. E. Hanke and his three sons, as copartners, engaged in the business of repairing automobiles, dispensing gasoline and automobile accessories, and selling used automobiles in Seattle. They conducted their entire enterprise themselves, without any employees. At the time the senior Hanke purchased the business in June, 1946, which had theretofore been conducted as a union shop, he became a member of Local 309 of the International Brotherhood of Teamsters, which includes in its membership persons employed and engaged in the gasoline service station business in Seattle. Accordingly, the Hankes continued to display in their show window the union shop card of their predecessor. Local 309 also included the Hankes' business in the list of firms for which it urged patronage in advertisements published in the Washington organ of the International Brotherhood of Teamsters, distributed weekly to members. As a result of the use of the union shop card and these advertisements, the Hankes received union patronage which they otherwise would not have had.

Automobile Drivers and Demonstrators Local 882, closely affiliated with Local 309 and also chartered by the International Brotherhood of Teamsters, includes in its membership persons engaged in the business of selling

used cars and used car salesmen in Seattle. This union negotiated an agreement in 1946 with the Independent Automobile Dealers Association of Seattle, to which the Hankes did not belong, providing that used car lots be closed by 6 p. m. on weekdays and all day on Saturdays, Sundays and eight specified holidays. This agreement was intended to be applicable to 115 used car dealers in Seattle, all except ten of which were self-employers with no employees.

It was the practice of the Hankes to remain open nights, weekends and holidays. In January, 1948, representatives of both Locals called upon the Hankes to urge them to respect the limitation on business hours in the agreement or give up their union shop card. The Hankes refused to consent to abide by the agreement, claiming that it would be impossible to continue in business and do so, and surrendered the union shop card. The name of the Hankes' business was thereafter omitted from the list published by Local 309 in its advertisements.

Soon afterwards the Local sent a single picket to patrol up and down peacefully in front of the Hankes' business between the hours of 8:30 a. m. and 5 p. m., carrying a "sandwich sign" with the words "Union People Look for the Union Shop Card" and a facsimile of the shop card. The picket also wrote down the automobile license numbers of the Hankes' patrons. As a result of the picketing, the Hankes' business fell off heavily and drivers for supply houses refused to deliver parts and other needed materials. The Hankes had to use their own truck to call for the materials necessary to carry on their business.

To restrain this conduct, the Hankes brought suit against Local 309 and its officers. The trial court granted a permanent injunction against the picketing and awarded the Hankes a judgment of $250, the sum stipulated by the parties to be the amount of damage occasioned

by the picketing. The Supreme Court of Washington affirmed. 33 Wash. 2d 646, 207 P. 2d 206.

The background in No. 364 is similar. George E. Cline engaged in the used car business in Seattle, performing himself the services of his business here relevant. He was induced by the threat of picketing to join Automobile Drivers Local 882 in 1946, and in that year he also became a member of the Independent Automobile Dealers Association of Seattle which negotiated with Local 882 the agreement as to business hours to which reference has been made.

In August, 1947, Cline advised Local 882 that he did not intend to continue membership in the union and that he was no longer a member of the Independent Automobile Dealers Association. He announced that he did not consider himself bound by the agreement as to business hours and that he intended to operate on Saturdays. When Cline proceeded to do so Local 882 began to picket his business.

The picketing was conducted peacefully, normally by two pickets who patrolled up and down carrying "sandwich signs" stating that Cline was unfair to the union. The pickets took down the automobile license numbers of Cline's patrons, and when inquiry was made by patrons as to why they were doing so, their reply was: "You'll find out." Because of interference by the pickets with the use of one of Cline's driveways, he was forced to close it to avoid the possibility of one of the pickets being run over. As a result of the picketing, Cline's business fell off and, as in No. 309, drivers for supply houses refused to deliver parts and other needed materials. Cline had to use his own vehicle to call for supplies necessary to carry on the business.

Local 882 reached a new agreement with the Independent Automobile Dealers Association in April, 1948. As a condition to removal of the picket line, the union

demanded that Cline agree to keep his business closed
after 1 p. m. on Saturdays and to hire a member of the
union as a salesman to be compensated at the rate of
seven percent of the gross sales regardless of whether they
were made by Cline or this employee. Suit by Cline to
restrain patrolling of his business resulted in a permanent
injunction against the union and its officers—Cline waived
his claim for damages—and the Supreme Court of Wash-
ington, relying on its decision in the *Hanke* case, af-
firmed. 33 Wash. 2d 666, 207 P. 2d 216.

In both these cases we granted certiorari to consider
claims of infringement of the right of freedom of speech
as guaranteed by the Due Process Clause of the Four-
teenth Amendment. 338 U. S. 903.

Here, as in *Hughes* v. *Superior Court, ante,* p. 460, we
must start with the fact that while picketing has an ingre-
dient of communication it cannot dogmatically be equated
with the constitutionally protected freedom of speech.
Our decisions reflect recognition that picketing is "indeed
a hybrid." Freund, On Understanding the Supreme
Court 18 (1949). See also Jaffe, *In Defense of the
Supreme Court's Picketing Doctrine,* 41 Mich. L. Rev.
1037 (1943). The effort in the cases has been to strike
a balance between the constitutional protection of the
element of communication in picketing and "the power
of the State to set the limits of permissible contest
open to industrial combatants." *Thornhill* v. *Alabama,*
310 U. S. 88, 104.[1] A State's judgment on striking

---

[1] It is relevant to note that the Alabama statute held unconstitu-
tional in the *Thornhill* case had been construed by the State courts
to prohibit picketing without "exceptions based upon either the
number of persons engaged in the proscribed activity, the peaceful
character of their demeanor, the nature of their dispute with an
employer, or the restrained character and the accurateness of the
terminology used in notifying the public of the facts of the dispute."
310 U. S. at 99.

such a balance is of course subject to the limitations of the Fourteenth Amendment. Embracing as such a judgment does, however, a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors, such judgment on these matters comes to this Court bearing a weighty title of respect.

These two cases emphasize the nature of a problem that is presented by our duty of sitting in judgment on a State's judgment in striking the balance that has to be struck when a State decides not to keep hands off these industrial contests. Here we have a glaring instance of the interplay of competing social-economic interests and viewpoints. Unions obviously are concerned not to have union standards undermined by non-union shops. This interest penetrates into self-employer shops. On the other hand, some of our profoundest thinkers from Jefferson to Brandeis have stressed the importance to a democratic society of encouraging self-employer economic units as a counter-movement to what are deemed to be the dangers inherent in excessive concentration of economic power. "There is a widespread belief . . . that the true prosperity of our past came not from big business, but through the courage, the energy and the resourcefulness of small men . . . and that only through participation by the many in the responsibilities and determinations of business, can Americans secure the moral and intellectual development which is essential to the maintenance of liberty." Mr. Justice Brandeis, dissenting in *Liggett Co.* v. *Lee*, 288 U. S. 517, 541, 580.

Whether to prefer the union or a self-employer in such a situation, or to seek partial recognition of both interests, and, if so, by what means to secure such accommodation, obviously presents to a State serious problems. There are no sure answers, and the best available solution

is likely to be experimental and tentative, and always subject to the control of the popular will. That the solution of these perplexities is a challenge to wisdom and not a command of the Constitution is the significance of *Senn* v. *Tile Layers Protective Union*, 301 U. S. 468. Senn, a self-employed tile layer who occasionally hired other tile layers to assist him, was picketed when he refused to yield to the union demand that he no longer work himself at his trade. The Wisconsin court found the situation to be within the State's anti-injunction statute and denied relief. In rejecting the claim that the restriction upon Senn's freedom was a denial of his liberty under the Fourteenth Amendment, this Court held that it lay in the domain of policy for Wisconsin to permit the picketing: "Whether it was wise for the State to permit the unions to do so is a question of its public policy—not our concern." 301 U. S. at 481.

This conclusion was based on the Court's recognition that it was Wisconsin, not the Fourteenth Amendment, which put such picketing as a "means of publicity on a par with advertisements in the press."[2] 301 U. S. at 479. If Wisconsin could permit such picketing as a mat-

---

[2] The Court said: "In declaring such picketing permissible Wisconsin has put this means of publicity on a par with advertisements in the press." 301 U. S. at 479. To assume that this sentence is to be read as though the picketing was permitted by Wisconsin not as a matter of choice but because the Fourteenth Amendment compelled its allowance is to assume that so careful a writer as Mr. Justice Brandeis, the author of the Court's opinion, meant the above sentence to be read as though it contained the bracketed insertion as follows: "In declaring such picketing permissible Wisconsin [recognized that the Fourteenth Amendment] has put this means of publicity on a par with advertisements in the press." In other words, it is suggested that the bracketed interpolation which Justice Brandeis did not write is to be read into what he did write although thereby its essential meaning would be altered.

ter of policy it must have been equally free as a matter of policy to choose not to permit it and therefore not to "put this means of publicity on a par with advertisements in the press." If Wisconsin could have deemed it wise to withdraw from the union the permission which this Court found outside the ban of the Fourteenth Amendment, such action by Washington cannot be inside that ban.[3]

Washington here concluded that, even though the relief afforded the Hankes and Cline entailed restriction upon communication that the unions sought to convey through picketing, it was more important to safeguard the value which the State placed upon self-employers, leaving all other channels of communication open to the union. The relatively small interest of the unions considerably influenced the balance that was struck. Of 115 used car dealers in Seattle maintaining union standards, all but ten were self-employers with no employees. "From this fact," so we are informed by the Supreme Court of Washington, "the conclusion seems irresistible that the union's interest in the welfare of a mere handful of members (of whose working conditions no complaint at all is made) is far outweighed by the interests of individual proprietors and the people of the community as a whole, to the end that little businessmen and property owners shall be free from dictation as to business policy by an outside group having

---

[3] Of course, the true significance of particular phrases in *Senn* appears only when they are examined in their context: "Clearly the means which the statute authorizes—picketing and publicity—are not prohibited by the Fourteenth Amendment. Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution. The State may, in the exercise of its police power, regulate the methods and means of publicity as well as the use of public streets." 301 U. S. at 478.

but a relatively small and indirect interest in such policy."
33 Wash. 2d at 659, 207 P. 2d at 213.

We are, needless to say, fully aware of the contentious
nature of these views. It is not our business even re-
motely to hint at agreement or disagreement with what
has commended itself to the State of Washington, or even
to intimate that all the relevant considerations are exposed
in the conclusions reached by the Washington court.
They seldom are in this field, so deceptive and opaque are
the elements of these problems. That is precisely what is
meant by recognizing that they are within the domain of
a State's public policy. Because there is lack of agree-
ment as to the relevant factors and divergent interpreta-
tions of their meaning, as well as differences in assessing
what is the short and what is the long view, the clash of
fact and opinion should be resolved by the democratic
process and not by the judicial sword. Invalidation here
would mean denial of power to the Congress as well as to
the forty-eight States.

It is not for us to pass judgment on cases not now
before us. But when one considers that issues not unlike
those that are here have been similarly viewed by other
States [4] and by the Congress of the United States,[5] we
cannot conclude that Washington, in holding the pick-

---

[4] See, e. g., Bautista v. Jones, 25 Cal. 2d 746, 155 P. 2d 343; Dinoffria
v. International Brotherhood of Teamsters and Chauffeurs, 331 Ill.
App. 129, 72 N. E. 2d 635; Saveall v. Demers, 322 Mass. 70, 76
N. E. 2d 12.

[5] Section 8 (b) (4) (A) of the National Labor Relations Act, as
amended by the Labor Management Relations Act, 1947, makes it an
unfair labor practice for a union "to engage in . . . a strike . . .
where an object thereof is: (A) forcing or requiring any employer
or self-employed person to join any labor or employer organization."
61 Stat. 141, 29 U. S. C. (Supp. III) § 158 (b) (4) (A). See also
§ 10 (l) of the National Labor Relations Act, as amended, and § 303
of the Labor Management Relations Act.

eting in these cases to be for an unlawful object, has struck a balance so inconsistent with rooted traditions of a free people that it must be found an unconstitutional choice. Mindful as we are that a phase of picketing is communication, we cannot find that Washington has offended the Constitution.

We need not repeat the considerations to which we adverted in *Hughes* v. *Superior Court* that make it immaterial, in respect to the constitutional issue before us, that the policy of Washington was expressed by its Supreme Court rather than by its legislature. The Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches. *Dreyer* v. *Illinois*, 187 U. S. 71, 83–84; *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 225. "[R]ights under that amendment turn on the power of the State, no matter by what organ it acts." *Missouri* v. *Dockery*, 191 U. S. 165, 170–71.

Nor does the Fourteenth Amendment require prohibition by Washington also of voluntary acquiescence in the demands of the union in order that it may choose to prohibit the right to secure submission through picketing. In abstaining from interference with such voluntary agreements a State may rely on self-interest. In any event, it is not for this Court to question a State's judgment in regulating only where an evil seems to it most conspicuous.

What was actually decided in *American Federation of Labor* v. *Swing*, 312 U. S. 321, *Bakery & Pastry Drivers & Helpers Local* v. *Wohl*, 315 U. S. 769, and *Cafeteria Employees Union* v. *Angelos*, 320 U. S. 293, does not preclude us from upholding Washington's power to make the choice of policy she has here made. In those cases we held only that a State could not proscribe picketing merely by setting artificial bounds, unreal in the light of modern

circumstances, to what constitutes an industrial relationship or a labor dispute.[6]  See Cox, *Some Aspects of the Labor Management Relations Act, 1947*, 61 Harv. L. Rev. 1, 30 (1947).  The power of a State to declare a policy in favor of self-employers and to make conduct restrictive of self-employment unlawful was not considered in those cases.  Indeed in *Wohl* this Court expressly noted that the State courts had not found that the picketing there condemned was for a defined unlawful object. 315 U. S. at 774.

When an injunction of a State court comes before us it comes not as an independent collocation of words.  It is defined and confined by the opinion of the State court. The injunctions in these two cases are to be judged here with all the limitations that are infused into their terms by the opinions of the Washington Supreme Court on the basis of which the judgments below come before us. So read, the injunctions are directed solely against picketing for the ends defined by the parties before the Washington court and this Court.  To treat the injunctions otherwise—to treat them, that is, outside the scope of the issues which they represent—is to deal with a case that is not here and was not before the Washington court. In considering an injunction against picketing recently, we had occasion to reject a similar claim of infirmity derived not from the record but from unreality.  What we then said is pertinent now: "What is before us . . . is not the order as an isolated, self-contained writing but the order with the gloss of the Supreme Court of Wisconsin upon it." *Hotel & Restaurant Employees' International Alliance* v. *Wisconsin E. R. B.*, 315 U. S. 437, 441.  Our affirmance of these injunctions is in con-

---

[6] As to the Court's duty to restrict general expressions in opinions in earlier cases to their specific context, see *Cohens* v. *Virginia*, 6 Wheat. 264, 399–400; *Armour & Co.* v. *Wantock*, 323 U. S. 126, 132–33.

formity with the reading derived from the Washington court's opinions. If astuteness may discover argumentative excess in the scope of the injunctions beyond what we constitutionally justify by this opinion, it will be open to petitioners to raise the matter, which they have not raised here, when the cases on remand reach the Washington court.

*Affirmed.*

MR. JUSTICE CLARK concurs in the result.

MR. JUSTICE BLACK dissents for substantially the reasons given in his dissent in *Carpenters & Joiners Union v. Ritter's Cafe*, 315 U. S. 722, 729-32.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of these cases.

MR. JUSTICE MINTON, with whom MR. JUSTICE REED joins, dissenting.

Petitioners in each of these cases were "permanently restrained and enjoined from in any manner picketing" the places of business of respondents. The picketing here was peaceful publicity, not enmeshed in a pattern of violence as was true in *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U. S. 287; nor was there violence in the picketing, as in *Hotel & Restaurant Employees' International Alliance v. Wisconsin E. R. B.*, 315 U. S. 437. The decrees entered in the instant cases were not tailored to meet the evils of threats and intimidation as *Cafeteria Employees Union v. Angelos*, 320 U. S. 293, 295, indicates they might have been; nor were they limited to restraint of picketing for the purpose of forcing the person picketed to violate the law and public policy of the state, as were the decrees in *Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490, and *Build-*

*ing Service Employees Union* v. *Gazzam, post,* p. 532, this day decided. The abuses of picketing involved in the above cases were held by this Court not to be protected by the Fourteenth Amendment from state restraint.

It seems equally clear to me that peaceful picketing which is used properly as an instrument of publicity has been held by this Court in *Thornhill* v. *Alabama,* 310 U. S. 88; *Carlson* v. *California,* 310 U. S. 106; *American Federation of Labor* v. *Swing,* 312 U. S. 321; *Bakery & Pastry Drivers & Helpers Local* v. *Wohl,* 315 U. S. 769; and *Cafeteria Employees Union* v. *Angelos,* 320 U. S. 293, to be protected by the Fourteenth Amendment. I do not understand that in the last three mentioned cases this Court, as the majority in its opinion says, "held only that a State could not proscribe picketing merely by setting artificial bounds, unreal in the light of modern circumstances, to what constitutes an industrial relationship or a labor dispute." If the states may set bounds, it is not for this Court to say where they shall be set, unless the setting violates some provision of the Federal Constitution. I understand the above cases to have found violations of the federal constitutional guarantee of freedom of speech, and the picketing could not be restrained because to do so would violate the right of free speech and publicity. This view is plainly stated by this Court in *Cafeteria Employees Union* v. *Angelos,* 320 U. S. at 295:

> "In *Senn* v. *Tile Layers Union,* 301 U. S. 468, this Court ruled that members of a union might, 'without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' 301 U. S. at 478. Later cases applied the *Senn* doctrine by enforcing the right of workers to state their case and to appeal for public support in an orderly and peaceful manner regardless of the area

of immunity as defined by state policy. *A. F. of L. v. Swing,* 312 U. S. 321; *Bakery Drivers Local v. Wohl,* 315 U. S. 769."

All the recent cases of this Court upholding picketing, from *Thornhill* to *Angelos,* have done so on the view that "peaceful picketing and truthful publicity" (see 320 U. S. at 295) is protected by the guaranty of free speech. This view stems from Mr. Justice Brandeis' statement in *Senn* that "Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." 301 U. S. 468, 478. In that case Justice Brandeis was dealing with action of Wisconsin that *permitted* picketing by a labor union of a one-man shop. Of course, as long as Wisconsin allowed picketing, there was no interference with freedom of expression. By permitting picketing the State was allowing the expression found in "peaceful picketing and truthful publicity." There was in that posture of the case no question of conflict with the right of free speech. But because Wisconsin could permit picketing, and not thereby encroach upon freedom of speech, it does not follow that it could forbid like picketing; for that might involve conflict with the Fourteenth Amendment. It seems to me that Justice Brandeis, foreseeing the problem of the converse, made the statement above quoted in order to indicate that picketing could be protected by the free speech guaranty of the Federal Constitution. Whether or not that is what Justice Brandeis meant, I think this Court has accepted that view, from *Thornhill* to *Angelos.* It seems to me too late now to deny that those cases were rooted in the free speech doctrine. I think we should not decide the instant cases in a manner so alien to the basis of prior decisions.

The outlawing of picketing for all purposes is permitted the State of Washington by the upholding of these broad

decrees. No distinction is made between what is legitimate picketing and what is abusive picketing. "[H]ere we have no attempt by the state through its courts to restrict conduct justifiably found to be an abusive exercise of the right to picket." *Angelos* case, 320 U. S. at 295.

Because the decrees here are not directed at any abuse of picketing but at all picketing, I think to sustain them is contrary to our prior holdings, founded as they are in the doctrine that "peaceful picketing and truthful publicity" is protected by the constitutional guaranty of the right of free speech. I recognize that picketing is more than speech. That is why I think an abuse of picketing may lead to a forfeiture of the protection of free speech. Tested by the philosophy of prior decisions, no such forfeiture is justified here.

I would reverse the judgments in these two cases.