**BLUE BOAR CAFETERIA CO., Inc. v. HO-TEL & RESTAURANT EMPLOYEES & BARTENDERS INTERNATIONAL UNION LOCAL NO. 181, et al.**

Court of Appeals of Kentucky.

Dec. 19, 1952.

Rehearing Denied Feb. 13, 1953.

Robert E. Hatton, Louisville, Henry T. Merritt, Louisville, for appellant.

Herbert L. Segal, Louisville, for appellees.

STEWART, Justice.

The primary question presented on this appeal is whether picketing under the facts of this case would require appellant, hereinafter referred to as "Blue Boar", to coerce its employees to join appellee, called herein "the union", in violation of KRS 336.130.

Blue Boar is a corporation which operates two cafeterias in the City of Louisville.

This controversy had its genesis on September 16, 1949, when Edward H. Weyler and Patrick F. Kirwan, representing the Louisville branch of the American Federation of Labor, hereinafter referred to as "Louisville A. F. of L.", asked Blue Boar to sign a contract with the union. A conference was arranged for and held on October 7, 1949, at the office of the then Commissioner of Industrial Relations in Frankfort, and, with the Commissioner present as a conciliator, the attorney for Blue Boar at that meeting proposed to the union representative that it would consent to an elec-

tion by its employees to determine whether or not they would vote to unionize, provided it was found that its employees holding union cards represented a substantial portion of its workers. This plan was rejected by the union official. Shortly thereafter, Blue Boar refused to permit the Commissioner, at the request of the union, to conduct an election on its premises, and this Court upheld Blue Boar's position on this issue. See Blue Boar v. Hackett, 312 Ky. 288, 227 S.W.2d 199.

On April 17, 1950, representatives of the union and Blue Boar met by agreement and the union again demanded that Blue Boar recognize it and bargain with it on behalf of its employees. Although Blue Boar was threatened with pressure if it rejected the union's proposal, it nevertheless did refuse to accede, stating as its reason that it did not believe its employees wanted to affiliate with the union. On May 26, 1950, the business agent of the union called a meeting of Blue Boar's employees. Blue Boar has a force of approximately 270, but only five of its employees went to this meeting and none of these would join the union. There is evidence to the effect that the union representative tried to get these five workers to go out on a strike. He offered to pay each of them one dollar per hour if he would picket Blue Boar and stated that no one would lose because the union had a strike fund. The five employees turned down this proposition.

On June 13, 1950, at a regular meeting of the Louisville A. F. of L., a resolution was adopted officially placing Blue Boar on the "We do not patronize" list, and all the local unions and the Kentucky Labor News were notified of this action. On June 20, 1950, representatives of the Louisville A. F. of L. met with officials of Blue Boar and a final demand was made that Blue Boar recognize the union as the bargaining agency of its employees, and Blue Boar was then told that if it did not consent it "would be subjected to other strenuous action." On June 22, 1950, the president of Blue Boar notified the president of the Louisville A. F. of L. that his Company would not yield to this demand. On June 27, 1950, picket lines were thrown around both of Blue Boar's cafeterias in Louisville. Persons who were not employees of Blue Boar passed out literature and carried signs which asked people not to patronize Blue Boar, and which requested suppliers not to deliver goods and customers not to tip waitresses at each of Blue Boar's cafeterias. One union official drove through the streets of Louisville with a large sign on his car urging the public not to patronize Blue Boar.

On June 28, 1950, an action was filed in Jefferson Circuit Court, Chancery Branch, Second Division, by Blue Boar to enjoin the union from picketing. A temporary restraining order issued without notice. Thereafter, at a hearing on a motion for a temporary injunction, an order sustaining the motion was entered July 13, 1950. In an opinion handed down at the same time, the Chancellor gave as his reasons for granting the temporary injunction that there was no controversy between Blue Boar and its employees and that the pickets were all nonemployees. This Court, five judges sitting, refused on July 14, 1950, to dissolve the temporary injunction.

For almost two years thereafter, this case lay dormant, and then, on June 6, 1952, the union filed an answer, and later, an amended answer, to the petition, denying the affirmative allegations therein and averring that a labor dispute existed at that time between the union and Blue Boar by reason of certain changed conditions, one being that Blue Boar had discharged five employees who were members of the union because of their purported activity for the union, and the other being that Blue Boar refused to recognize the union as the bargaining agent of its employee-members which the union said it represented.

The Chancellor found, at the conclusion of the hearing, that there was not sufficient proof to draw the inference that the five employees in question were in fact discharged because of their activity in behalf of the union, and we think the proof amply sustains this finding by the Chancellor. Twelve other employees, still working for Blue Boar, which the union claims are members it represents, were never identified. The union testified that the names of these

workers were kept secret for their protection, because it is contended Blue Boar would fire them if it learned who they are. The proof does not, in our opinion, support this contention. The Chancellor concluded, as a matter of law, that the union was entitled to picket peacefully "in order to disseminate (to the public) information relative to the grievances it is claiming," although there was no labor dispute between Blue Boar and its employees, and although Blue Boar was not guilty of any unfair labor practice. An order was entered permitting the union to peacefully picket both places of business of Blue Boar with no more than two pickets at each entrance and one picket captain for each establishment. On October 17, 1952, this Court granted an order suspending picketing pending this appeal.

■ A proper approach to this case, we think, necessitates a clear understanding of the development of picketing and its present-day legal meaning. Under the common law labor activity, whether taking the form of strikes, picketing or boycotts, was prima facie a tort, and such concerted action was permissible only upon a showing of legal justification, because such activity impeded the free market. In 1937, the Supreme Court in Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, advanced for the first time by way of dictum the concept that picketing was wedded to the constitutional guaranty of free speech. The Court, speaking through Mr. Justice Brandeis, said: "Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." Id. 301 U.S. at page 478, 57 S.Ct. at page 862. Dictum soon became established law, and the import of this new doctrine meant, first, that picketing was no longer to be classified as a prima facie tort burdened with the task of proving justification for such conduct, and next, that picketing had become entirely a federal question, and therefore the Supreme Court, rather than the several state courts, was vested with final jurisdiction over picketing cases.

The Senn case set the stage for the Supreme Court to determine whether picketing should be considered an "absolute right" or a "qualified privilege" of free speech. The cases of Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, were both decided in 1940 on the same day and both are milestones on the road followed by that Court in its quest for the meaning of picketing as it relates to free speech; but each case, after admitting that picketing was apparently akin to free speech, regarded the nature of the kinship as obscure. In 1941, the Supreme Court decided Milk Wagon Drivers Union, Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, and in that case spoke of picketing as an inalienable right. It was in the case of American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, that the identification of picketing with free speech attained its greatest intensity. This case held that peaceful picketing could not constitutionally be enjoined even though it was carried on by a union in the absence of a labor controversy between the picketed employer and his employees. It did hold, however, that labor activity accompanied by acts of extreme violence was enjoinable. More than that, the Swing case encroached upon and virtually changed the common law of several states.

The case of Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 810, 86 L.Ed. 1143, for the first time since dictum in the Senn case had identified picketing with free speech, used language implying that a distinction existed between "picketing" and "other traditional modes of communication." This statement was made arguendo and was unaccompanied by an explanation. Bakery & Pastry Drivers & Helpers Local v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, decided the same day in 1942 that the Ritter's Cafe opinion was handed down, pointed out that picketing may include conduct other than speech, namely, conduct which may be made the subject of restrictive legislation. Thus we note a trend on the

part of the Supreme Court in two directions: First, to apply to peaceful picketing a new and extended meaning besides its identification with free speech, based upon its social and economic consequences, and second, to reinvest the several state courts with jurisdiction to exercise control over organized labor where its activity contravenes the law or the public policy of the state.

By the latter part of 1949, the Supreme Court had arrived at a realistic interpretation of picketing and in Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 721, 94 L.Ed. 985, had this to say on the subject: "But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing 'is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.'" The Court in the same case upheld a state's right to restrain acts and conduct which are an abuse of the right to picket, using these words: "It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance." See Giboney v. Empire Storage Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Building Service Employees International Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; and see also International Brotherhood of Teamsters v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995, decided in 1950, where the Supreme Court veered away from the broad doctrine laid down in the Swing case. Reference is made to Teller, Picketing and Free Speech, 56 Harv. L.Rev., pp. 180–218.

With the foregoing background to guide us we now turn to a consideration of the law applicable to the facts of this case. The Chancellor was of the opinion that he was controlled in his finding of law by the case of Blanford v. Press Publishing Co., 286 Ky. 657, 151 S.W.2d 440, and subsequent opinions following this decision. The Blanford case, decided in 1941, was one of the first opinions of this Court dealing with a labor issue after the passage of KRS 336.130, Chap. 105 of the 1940 Acts of the General Assembly, which reads as follows:

"(1) Employes may, free from restraint or coercion by the employers or their agents, associate collectively for self-organization and designate collectively representatives of their own choosing to negotiate the terms and conditions of their employment to effectively promote their own rights and general welfare. Employes, collectively and individually, may strike, engage in peaceful picketing, and assemble collectively for peaceful purposes.

"(2) Neither employers or their agents nor employes or associations, organizations or groups of employes shall engage or be permitted to engage in unfair or illegal acts or practices or resort to violence, intimidation, threats or coercion."

The chief point determined in the Blanford case was whether there can be peaceful picketing in relation to any dispute between an employer and a labor union unless the employer's own employees are in controversy with him. The learned Justice who wrote that opinion held, and we think then rightly so, that this Court was bound by the interpretation the Supreme Court had given to picketing at that time. It should be emphasized that the Swing case immediately preceded and controlled this Court's decision in the Blanford case and the Swing case evidenced a federalization of the picketing law in that picketing was completely identified with free speech. Significantly, the employer in the Blanford case did not raise any question to the effect that the picketing being done there was for the purpose of forcing him to violate the law of the state by coercing his employees to join a union. Subsequently, Boyd v. Deena Artware, Ky., 239 S.W.2d 86, and Whitt v. Stephens, Ky., 246 S.W.2d 996, reaffirmed by way of dictum the proposition of law we have adverted to in the Blanford case. In Broadway &

Fourth Avenue Realty Co. v. Local No. 181, Ky., 244 S.W.2d 746, 748, we made it clear "* * * that an act by an employer which would be a crime or a violation of a legislative enactment or contrary to a defined public policy is not a proper object of concerted action against him by workers. * * *"

We now come to the question of whether picketing in this case has been and is now illegal because its purpose is to coerce Blue Boar to violate the law of this state as set forth in KRS 336.130.

The union seeks to base its case upon the narrow contention that it represents the five employees who were discharged and that it is on behalf of these persons that it is entitled to be considered by Blue Boar as a bargaining agent. While we have doubts as to whether these persons, discharged for cause, possess the necessary employee status to form the basis for such representation, we feel that the record will not support the ground urged by the union, because the facts are undisputed that each time representatives of Blue Boar and the union met, the union demanded that Blue Boar recognize it and bargain with it on behalf of its employees. Because Blue Boar will not "recognize" it or contract to "organize" with it, the union insists it has a legal right to picket Blue Boar's premises in order "to acquaint the public with these facts." Are we to accept the union's explanation of its conduct or should we appraise the effect of the union's conduct under the circumstances? The answer to this query, we believe, is aptly expressed in these words of Professor Sylvester Petro of New York University in the November, 1951, Labor Law Journal:

"Picketing for organizational purposes is only fictionally different from picketing for immediate recognition. The same kind of pressure on both employer and employees exists in either case; furthermore, the union is trying to force the employer to coerce his employees in either case; and finally, the union's basic desire—the desire for exclusive bargaining status—is the same in either case. The only difference relates not to the conduct of the union, or its effects, but to the union's explanation of its conduct. To make legal decisions vary on such a basis seems peculiar, if not unique."

The union argues that, even assuming a labor controversy does not exist between it and Blue Boar, peaceful picketing is nevertheless allowable in this case under the law of the state in order to disseminate information relative to the grievances it is claiming against Blue Boar. If the picketing is considered in isolation we could easily arrive at the conclusion that this assertion might have some merit; but, when we set it up against the factual background of this case, it forms part of a pattern which clearly shows that the union has employed methods, from the very beginning, which we think could have had no other effect than to coerce Blue Boar to compel all its employees to unionize. There is an abundance of proof to establish the fact that pressure has been exerted on Blue Boar to compel it to sign a contract with the union and recognize the union as a sole bargaining agent for all its 270 employees. Had Blue Boar entered into this contract and lived up to its terms, its employees would have been coerced by it to join the union, regardless of their wishes. Had Blue Boar recognized this union as the exclusive bargaining agent of its employees, the latter would have been forced to deal solely with this particular union. It follows that the employees would have had no free choice as to whether or not they wished to organize or what union they desired as their bargaining representative. We therefore conclude that the picketing in this case would, if allowed, result in coercing Blue Boar to resort to compulsion to force its employees to join the union in violation of KRS 336.130.

In view of our decision, it becomes unnecessary to consider the other grounds urged for reversal.

Wherefore, the judgment is reversed with directions that it be set aside and a new one entered in conformity with this opinion.