279 So.2d 467

**AMERICAN RADIO ASSOCIATION, AFL-CIO, etc., et al.**

v.

**MOBILE STEAMSHIP ASSOCIATION, INC., et al.**

**SC 12.**

Supreme Court of Alabama.

May 3, 1973.

Rehearing Denied July 5, 1973.

Simon & Wood, Mobile, Schulman, Abarbanel & Schlesinger, New York City, for appellants.

Frank B. McRight and Kirk C. Shaw, Mobile, for appellee Mobile Steamship Ass'n.

Alex F. Lankford, III, Mobile, for appellee Robert E. Malone.

McCALL, Justice.

The American Radio Association, AFL–CIO, an unincorporated labor organization, and other respondents in this cause, hereafter sometimes called the "Unions," appeal from an order of the circuit court, granting, after notice and a court hearing, a writ of temporary injunction, enjoining and restraining the appellants from picketing.

The appellee Mobile Steamship Association, Inc. is the representative and agent of numerous steamship and contract stevedoring companies who do business at the Port of Mobile. The appellee acts as collective bargaining representative and contract negotiator on behalf of its several principals in their business relations with local unions of the International Longshoremen's Association, who supply the stevedoring services for the loading and discharging of cargo carried by numerous ships calling at the Port of Mobile.

The appellee, Robert E. Malone, who was allowed to intervene in the cause, is a farmer in Mobile County. He grows soybeans which are delivered in sale by him at the grain elevator at the Alabama State Docks. Soybeans are exported by ship through the State Docks facility.

Shortly after noon on November 3, 1971, pickets for several of the appellant unions appeared at land entrances to the Alabama State Docks at Mobile, picketing and patrolling with uniform signs reading as follows:

" 'ATTENTION TO THE PUBLIC

" 'The wages and benefits paid aboard the vessel SS AQUA GLORY and the SS BEL HUDSON are substandard to those of the American seamen. This results in extreme damage to our wage standard and the loss of our jobs.

" 'Please do not patronize these vessels. Help the American seamen.

" 'We have no dispute with other vessels at this site.' "

The names of the picketing unions appeared beneath the quoted matter.

In addition to carrying the picketing signs, the pickets distributed to those persons, who asked if they should cross the picket line, leaflets which read as follows:

"TO THE PUBLIC

"American Seamen have lost approximately 50% of their jobs in the past few years to foreign flag ships employing seamen at a fraction of the wages of American Seamen.

"American dollars flowing to these foreign ship owners operating ships at wages and benefits substandard to American Seamen, are hurting our balance of payments in addition to hurting our economy by the loss of jobs.

"A strong American Merchant Marine is essential to our national defense. The fewer American flag ships there are, the weaker our position will be in a period of national emergency.

"PLEASE PATRONIZE AMERICAN FLAG VESSELS, SAVE OUR JOBS, HELP OUR ECONOMY AND SUPPORT OUR NATIONAL DEFENSE BY HELPING TO CREATE A STRONG AMERICAN MERCHANT MARINE.

"Our dispute here is limited to the vessel picket at this site, the SS ———."

The names of the unions again appeared at the bottom of the leaflets.

Two days later the pickets shifted to pier side, where the S.S. Aqua Glory and S.S. Bel Hudson were berthed. Soon afterwards the pickets were withdrawn from the Bel Hudson, a ship of British registry.

The Aqua Glory was a foreign-flag ship of Liberian registry, engaged in carrying cargo in foreign commerce, and manned by a crew of alien seamen. No more than four persons engaged in the picketing along pier side at the gangway to the Aqua Glory. No breach of contract was involved. The picketing was peaceful and without any violence. There was no mass picketing, no trespassing on the property of others, no blocking of ingress or egress, no shouting, no assaults, and no overt acts of force. The pickets, while on duty carried their signs, but refused to converse with other individuals. They remained silent and only referred inquisitors to their picketing signs and handed them one of the above described leaflets. The appellant unions asserted that they purposed to picket all foreign-flag ships that docked at the port in order to evidence a nationwide protest by American Maritime Workers over the loss of their jobs to foreign-flag vessels which paid wages and benefits substandard in contrast to those paid on American-flag vessels. The appellants insisted that they would attack the problem of the loss of job opportunities for American seamen in the United States to foreign-flag vessels by publicity or informational picketing and the distribution of literature in selected American ports, including the Port of Mobile, requesting the public not to patronize foreign-flag vessels which were picketed, but to patronize American-flag vessels, pointing out to the public that wages and benefits paid to foreign-flag seamen were vastly inferior to those paid American seamen.

Posting the pickets, as was done on the dock adjacent to the Aqua Glory, brought about an immediate refusal by the stevedore workers of the locals of International Longshoremen's Association to cross the picket line of the appellant unions. About eighty percent of the cargo ships that enter the Port of Mobile, sail under a foreign-flag and are manned by alien crews.

The appellees complained that the picketing was illegal because it interfered with contractual relations between members of the appellee association and companies owning and operating foreign-flag vessels, and, wrongfully interfered with lawful business of the appellees.

There was no dispute between the operators of the Aqua Glory and her foreign crew. But there was a labor dispute between the American unions and the operators of the Aqua Glory. This was brought about by substandard wages and benefits, resulting in loss of jobs by American seamen. The American unions contend that they are seeking relief from this situation. A labor dispute includes any controversy concerning terms, tenure or conditions of employment, regardless of whether the disputants stand in the proximate relation of employee and employer. 29 U.S.C. § 152(9).

The threshold point for determination is, granting there is a labor dispute between the unions and the foreign companies, is it a "labor dispute" of such nature that the Labor Management Relations Act, 29 U.S.C. § 141 et seq., preempts the jurisdiction of the state courts of Alabama?

The appellants contend that the jurisdiction of the state court is preempted by the Labor Management Relations Act, 29 U.S.C. § 141 et seq. and that exclusive jurisdiction of the case is reserved to the National Labor Relations Board. In opposition the appellees assert that the jurisdictional provisions of the National Labor Relations Act, 29 U.S.C. § 151 et seq. as amended by the Labor Management Relations Act, 1947, 29 U.S.C. § 141 et seq. do not extend to maritime operations of foreign-flag ships employing alien seamen. 48 Am.Jur. 2d, § 405, p. 296. If the appellees' insistence be a correct statement of law, then, under the facts in this case, the state court did not lack jurisdiction to entertain this suit in equity as urged by the appellants.

As already pointed out, there is a labor dispute here between the unions and foreign ship companies over terms, tenure and conditions of employment by them of their foreign crews. The picketing of the foreign ship has the effect to both publicize the unions' grievance against substandard wages as well as to bring pressure on the foreign employer to pay its seamen higher wages and provide them additional benefits. This purpose is borne out by the language of the placards and leaflets. The Supreme Court of the United States has refused to apply the provisions of the National Labor Relations Act in instances concerning the internal affairs of foreign ships even when in American ports and arguably affecting the American economy. Congress has not clearly extended NLRB jurisdiction to such matters and the court has been unwilling to find board jurisdiction in an area where international relations are involved. McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963).

In McCulloch v. Sociedad Nacional de Marineros de Honduras, supra, United Fruit Company, a New Jersey corporation, owned all of the stock of Empresa Hondurena de Vapores, S.A., a Honduran corporation, which legally owned each of the vessels, sought to be unionized. Each vessel flew a foreign flag, carried a foreign crew and had other contacts with the nation of its flag. The National Labor Relations Board ordered an election in a representation proceeding on application of the National Maritime Union, which had the effect of canceling the bargaining contract that Empresa's seamen had with their Honduran Union, Sociedad. Sociedad brought one of the suits involved on appeal to prevent the election.

The court said that the basic question was whether the NLRA as written was intended to have any application to foreign registered vessels employing only alien seamen. After noting that the Congress and the State Department had recognized the right of foreign ships to conduct their own internal affairs, the court concluded, citing Benz v. Compania Naviera Hidalgo, 353 U.S. 138 at 147, 77 S.Ct. 699 at 704, 1 L.Ed.2d 709, that "to sanction the exercise of local sovereignty under such conditions in this 'delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed.' "

Explaining further its rationale, the court, 372 U.S. at p. 18, 83 S.Ct. at p. 676, in *McCulloch,* supra, said:

"Six years ago this Court considered the question of the Taft-Hartley amendments to the Act in a suit for damages 'resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel [was] temporarily in an American port.' Benz v. Compania Naviera Hidalgo, supra, 353 U.S., at 139, 77 S.Ct., at 700, 1 L.Ed.2d 709. We held that the Act did not apply, searching the language and the legislative history and concluding that the latter 'inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions.' Id., at 144, 77 S.Ct., at 702, 703, 1 L.Ed.2d 709. Subsequently, in Marine Cooks & Stewards v. Panama S. S. Co., 362 U.S. 365,

80 S.Ct. 779, 4 L.Ed.2d 797 (1960), we held that the Norris-LaGuardia Act, 29 U.S.C. § 101, deprived a Federal District Court of jurisdiction to enjoin picketing of a foreign-flag ship, specifically limiting the holding to the jurisdiction of the court 'to issue the injunction it did under the circumstances shown.' Id., at 372, 80 S.Ct., at 784, 4 L.Ed.2d 797. That case cannot be regarded as limiting the earlier Benz holding, however, since no question as to 'whether the picketing . . . was tortious under state or federal law' was either presented or decided. Ibid. Indeed, the Court specifically noted that the application of the Norris-LaGuardia Act 'to curtail and regulate the jurisdiction of courts' differs from the application of the Taft-Hartley Act 'to regulate the conduct of people engaged in labor disputes.' Ibid.; see Comment, 69 Yale L.J. 498, 523–525 (1960)."

Again in Incres Steamship Company v. International Maritime Workers Union, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), the facts involved an American seamen's union picketing a foreign owned vessel, manned by a foreign crew, in a campaign to organize the crew. The court held that the NLRB was without jurisdiction, saying:

"We held today in Sociedad Nacional that the Act does not apply to foreign-registered ships employing alien seamen. The holding and reasoning in that case are equally applicable to the maritime operations here, leading to the conclusion that the Act does not apply. It is true that our decision in Garmon [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)], supra, as applied in Marine Engineers Beneficial Assn. v. Interlake S.S. Co., 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962), results in pre-emption of state court jurisdiction if a dispute is arguably within the jurisdiction of the Board. But, although it was arguable that the Board's jurisdiction extended to this dispute at the time of the New York Court of Appeals' decision, our decision in Sociedad Nacional clearly negates such jurisdiction now. In that case we were immediately concerned with the Board's jurisdiction to direct an election, holding that the Act had no application to the operations of foreign flagships employing alien crews. Therefore, no different result as to Board jurisdiction follows from the fact that our immediate concern here is the picketing of a foreign-flag ship by an American union. See Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957). The Board's jurisdiction to prevent unfair labor practices, like its jurisdiction to direct elections, is based upon circumstances 'affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of § 2(6), 29 U.S.C. § 152(6)."

Applying the rationale of the above decisions of the Supreme Court of the United States to the facts of the case at hand, we conclude that the Labor Management Relations Act of 1947 does not apply in this case and did not preempt the state court from entertaining jurisdiction of the cause. The dispute was either one between the unions and the foreign shipowners to force a raise in the internal standards of those vessels, or one where the intent was to block use of those ships to force Congress to act in the international sphere, which in either case are matters affecting international relations and not properly for NLRB jurisdiction.

We disagree with the appellants' contention that the state court may not grant injunctive relief because the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., prohibits the issuance of any restraining order or temporary or permanent injunction by a state court in a peaceful labor dispute.

The Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. provides as follows:

"No court of the United States, as defined in this chapter, shall have jurisdic-

tion to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

29 U.S.C. § 113(d) defines the term "court of the United States" as follows:

"(d) The term 'court of the United States' means any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia."

■ The anti-injunction provisions of the Norris-LaGuardia Act are not applicable to state courts and hence, do not deprive them of jurisdiction to issue an injunction in a case involving a labor dispute.

In Ford v. Boeger, 362 F.2d 999 (1966); certiorari denied sub nom Curtis v. Boeger, 386 U.S. 914, 87 S.Ct. 857, 17 L.Ed.2d 787; petition for rehearing denied 386 U.S. 978, 87 S.Ct. 1160, 18 L.Ed.2d 140; motion for leave to file second petition for rehearing denied 387 U.S. 949, 87 S.Ct. 2072, 18 L. Ed.2d 1341, the court said:

"Petitioners' reliance upon the Norris-LaGuardia anti-injunction Act, 29 U. S.C.A. § 101 et seq., is misplaced. The Norris-LaGuardia injunction limitations are imposed only upon courts of the United States. The Court of Appeals for the Third Circuit in American Dredging Co. v. Local 25, etc., 3 Cir., 338 F.2d 837, 850–856, clearly and convincingly demonstrates why the prohibition applies only to federal courts—not to state courts."

In the cited case of American Dredging Co. v. Local 25, Marine Div., Int'l Union of Operative Eng'rs, 338 F.2d 837, 852 (3d Cir. 1964), certiorari denied 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965), the court stated:

"There is nothing in the language of the Act or its legislative history which can possibly, within 'the range of judicial inventiveness', or the process of judicial fashioning, be construed as extending to the jurisdiction of state courts."

Among other cases holding without merit the contention that the Norris-LaGuardia Act deprived the court below of jurisdiction to issue the injunction in this labor dispute are the following decisions of state courts: Shaw Electric Co., Inc. v. International Brotherhood Electrical Workers, Local Union 98, 418 Pa. 1, 208 A.2d 769 (1965); South Atlantic and Gulf Coast District, International Longshoremen's Ass'n v. Producers Grain Corporation, 437 S.W.2d 33 (Tex.Civ.App.1969).

■ We are aware that there is considerable difference of thought on the legality of state court injunctions in matters involving labor disputes. To this we can only say that generally where there is a clearly defined labor dispute affecting commerce the NLRB has jurisdiction preemptive of all courts state and federal. But, as here, where the dispute is one where commerce, as covered by the federal act, is not involved, and the resulting effect, albeit non-direct, of the dispute immediately endangers the business activities of a large segment of the area's population, we think that it is neither illegal nor improper for the court to take jurisdiction and deal temporarily with the subject matter.

The second tier of the dispute on appeal involves the propriety of the issuance of the temporary injunction. Specifically, even though there was no NLRB preemption, was the activity involved protected by the First Amendment as free expression; or was it such unlawful interference with the business of another as will be enjoined under our state laws?

■ The appellant unions contend that their activity is protected as free speech under the United States Constitution as construed in Thornhill v. Alabama, 310 U.

S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and its progeny. We are mindful however of the characterization of similar matters as "speech plus," that is, speech with collateral consequences involved that invite regulation, or, as matters excepted from First Amendment protection because of overriding state interest. The First and Fourteenth Amendments do not afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets as those amendments afford to those who communicate by pure speech.

The case of International Brotherhood of Teamsters v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957) has approached resolving the issue in the labor forum. In *Vogt*, a union, having a dispute with a group of nonunion workers, picketed the employer's place of business. In consequence, truckers of other employers refused to haul to and from Vogt's business. The neutral employer sought and obtained a state court injunction. The court noted the historical development of the theory that labor picketing is protected free speech, beginning in the Thornhill case, supra, and furthered in AF of L v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941). After analyzing these decisions, the *Vogt* case, supra, went on to admit that the reach of those opinions had perhaps exceeded practicality, and discussed three subsequent Supreme Court cases which strongly parallel the present dispute. In Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 497, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949), the court said:

"It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgment of free speech because the picketers were attempting peacefully to publicize truthful facts about a labor dispute. * * * But the record here does not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings, and the argument of the appellants, the sole immediate object of the publicizing adjacent to the premises of Empire, as well as the other activities of the appellants and their allies, was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities * * * constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. * * *"

In Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), and in International Brotherhood of Teamsters Union v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 975 (1950), state court injunctions against picketing were upheld on a showing that the courts were effecting a valid state interest or public policy. In *Hughes,* the policy was against racial-quota hiring and in *Hanke* the policy was the avoidance of forced union ship agreements. The court in *Vogt* held that, while states cannot enact blanket prohibitions against picketing, where there are conflicting interests between the picketers and the public policy of a state, the picketing can be enjoined, and allowed the state court injunction against picketing to stand.

In the instant case as will be shown infra, we think there was evidence sufficient to support a finding that the action of the unions was in part with the goal of interfering with the business of the appellees in their shipping and farming operations. The United States Court of Appeals for the First Circuit has recently noted that there is a valid state interest in the preservation of local economy.

In Grinnell Corp. v. Hackett, 475 F.2d 449 (CA 1st Cir., March 15, 1973) which admittedly did not involve a picketing injunction, the court recognized two economic and social effects which are valid interests of the state and may be considered in labor disputes. The first of the two effects, the avoidance of violence in strikes, is not here present, but the second recognized effect of a labor dispute is. The court noted that a state may be validly

concerned with the "avoidance of economic stagnation in the local community" caused by strike activity.

We feel the Circuit Court in Mobile County could validly consider the economic effects of the picketing at the particular time the dispute was in progress and issue its order ceasing all picketing until the underlying questions could, be resolved without unlawfully interfering with appellants' rights to express themselves on the disputed issue.

While peaceful picketing, standing alone, is conceded to be lawful and is not to be enjoined, picketing still may be enjoined if it is done in an unlawful manner or for an unlawful purpose. Local No. 612, International Brotherhood of Teamsters v. Bowman Transportation, Inc., 276 Ala. 563, 165 So.2d 113 (1964); Baggett Transportation Co. v. Local No. 261, United Wholesale & Warehouse Employees Union, 259 Ala. 19, 65 So.2d 506 (1953); Hotel & Restaurant Employees, International Alliance v. Greenwood, 249 Ala. 265, 30 So.2d 696 (1947); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The conduct of picketing, if done in an unlawful manner or for an unlawful purpose, is not beyond the control of a state. Baggett Transportation Co. v. Local No. 261, United Wholesale and Warehouse Employees Union, supra; Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950). If the purpose or object for the picketing, or any of the purposes or objects therefor, is interference with the right of a third party to conduct his business, the picketing is wrongful and may be enjoined. International Brotherhood of Teamsters v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).

In Pennington v. Birmingham Baseball Club, 277 Ala. 336, 170 So.2d 410 (1964), the court said:

"* * * [T]he right to conduct one's business without the wrongful interference of others is a valuable property right which will be protected if necessary, by injunctive process. Carter v. Knapp Motor Co., 243 Ala. 600, 11 So.2d 383, 144 A.L.R. 1177."

So the bare question in this case narrows to whether or not there was a purpose or objective on the appellants' part to wrongfully interfere with the appellees' business, or was the picketing to publicize the appellants' cause with mere resulting incidental interference to appellees' business? The trial judge's decree, granting the writ of temporary injunction, made no finding of fact from the evidence. But apparently the trial judge found from the evidence that there was wrongful interference by the appellants with the appellees' business, for otherwise, he would not have ordered the writ of temporary injunction to issue.

The appellants contend that their only purpose was to carry out publicity picketing to inform the public and Congress of the plight of the American seamen. The appellee contends that the picketing was done for the purpose of inducing and encouraging the appellee's employees to cease loading the soybeans aboard foreign ships thereby interfering with the business of its member employers.

We must decide whether .the trial judge abused his discretion by concluding that there was wrongful interference with the appellee's business, warranting his issuance of the temporary writ. In this situation some well known equitable principles should be kept in mind. Among these, it is to be remembered that, in determining whether or not a temporary injunction should have issued, wide discretion is accorded the trial judge hearing the application and making the decision, and, where no abuse of that discretion is shown, his action will not be disturbed on appeal. Slay v. Hess, 252 Ala. 455, 41 So.2d 582 (1949); Jones v. Jefferson County, 203 Ala. 137, 82 So. 167 (1919); Holcomb v. Forsyth, 216 Ala. 486, 113 So. 516 (1927); Boatwright v. Town of Leighton, 231 Ala. 607, 166 So. 418 (1936).

In Madison Limestone Co. v. McDonald, 264 Ala. 295, 300, 87 So.2d 539, 543 (1956), we said this:

"* * * When the bill contains equity, the trial judge, in granting a temporary injunction to preserve the status quo until the final hearing, exercises a wide discretion, taking into consideration the relative advantages and disadvantages resulting from granting or refusing to grant the injunction. Unless that discretion is abused it will not be disturbed on appeal. Slay v. Hess, supra; Loop National Bank v. Cox, [255 Ala. 388, 51 So.2d 534] supra."

And, a sequel to the theories of balancing conveniences between the parties and the discretionary power of the trial judge to maintain the status quo until the final hearing, is the premise that the issue of who will prevail on final hearing is not concluded on a preliminary hearing to determine whether an injunction pendente lite will issue or not. In Hamilton v. City of Anniston, 248 Ala. 396, 401, 27 So. 857, 861 (1946), the court said:

"* * * The right to temporary injunction does not depend on any advance finding for complainant on the merits. Odoms v. Woodall, 246 Ala. 427, 20 So. 2d 849; Berman v. Wreck-A-Pair Bldg. Co., 234 Ala. 293, 175 So. 269. It is not necessary that complainant must present a case which will certainly entitle him to a decree upon a final hearing for he may be entitled to temporary injunction though his right to relief may ultimately fail. If the bill clearly shows a substantial question to be decided, a temporary injunction to preserve the status quo is in order. Glass v. Prudential Ins. Co. of America, 246 Ala. 579, 22 So.2d 13; Coxe v. Huntsville Gaslight Co., 129 Ala. 496, 29 So. 867." See also East Gadsden Bank v. Bagwell, 273 Ala. 441, 445, 143 So.2d 438.

We have no reason to assume otherwise than that the trial judge, in the exercise of the wide discretion accorded him in a matter of this kind, gave close heed to the issues involved, and concluded that while a substantial question remained to be decided, the immediate circumstances obliged him to order the temporary writ. Even so, we must consider the record to determine whether the trial judge abused his discretion in granting the temporary injunction. This necessitates our deciding whether or not there was any evidence to support a conclusion that the picketing had as a purpose or object the wrongful interference with the appellee's business.

During the course of the cross-examination of a witness for appellant unions, the following question and answer colloquy occurred:

"Q What percentage of the vessels that call here at the Port [of Mobile] are of foreign flags?

"A I would say about 70 to 80 percent.

"Q Yes, sir. And it's your instructions from your International Headquarters to picket 70 or 80 percent of the vessels that call at the Port of Mobile?

"A Within my resources, yes, to picket every one.

"Q All right, sir. And you would assume, as a man knowledgeable in the field of labor picketing that good labor men and good Union men would not cross those picket lines?

"A We were hoping that they wouldn't do that.

"Q Yes, sir. And this hope has been fulfilled in the Port of Mobile as far as longshoremen are concerned, isn't that true?

"A Well, to a point, yes.

"Q *Now, would it not be then a fair conclusion to say that you had hoped and do hope that you will be able to prevent 70 or 80 percent of the vessels in the Port of Mobile from loading or from unloading cargo?*

"A  *My hope is to clutter up the Port of Mobile with foreign flags—Liberian, Panamanian ships—to bring sufficient pressure on the United States Government to do something about the American merchant marine.*

"Q  That's your intention?

"A  *Yes, sir.*

"Q  That's your purpose?

"A  *Yes, sir.*  (Emphasis supplied)

\*  \*  \*  \*  \*  \*

"Q  All right, sir.  But you realize that your picketing is keeping members of the Mobile Steamship Association from loading and unloading these vessels that you are picketing, do you not?

"A  That is not the purpose of our picket line.

"Q  No, sir, I didn't ask you the purpose.  You realize today that your picketing is preventing members of the Association from loading and unloading these vessels that you are picketing?

"A  *I hope that my picket line will shut the whole State Docks down and let everybody go home for a while.  I hope I can do that.  Not just the Mobile Steamship Association."*  (Emphasis supplied)

In 51A C.J.S. Labor Relations § 319, p. 135, we find a statement of law that is material in a decision of this matter.  It reads as follows:

"*Expectation, hope, or desire.*  While it has been said that Congress did not intend to proscribe all actions accompanied merely by hope that such activity would affect the business relations between the primary and neutral employers, if picketing is conducted by a primary union with an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take concerted action, so that the secondary employer will cease doing business with

the primary employer, the act bars such activity."

The Fifth Circuit Court of Appeals stated in Superior Derrick Corporation v. National Labor Relations Board, 273 F.2d 891, 897 (5th Cir. 1960):

" \* \* \* [I]f there is an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take concerted action so that the secondary employer will cease doing business with the primary employer, then the Act bars that activity. \* \* \* The activity, including the picket line, must be conducted in such a way that the normal appeal of a picket line is overcome.  It must be done so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer. \* \* \*"

■ If a purpose or an objective of the picketing was to crowd the Port of Mobile with foreign ships calling there to load and unload cargo, in order to bring pressure on the federal government to do something about the American merchant marine, or, if the picketing was being carried on with the hope or expectation or desire to shut down the whole State Docks, not just the appellee, Mobile Steamship Company, so no one could work, then we think a substantial question would arise as to whether or not another intended purpose of the picketing was interference with appellee's business, which was the loading and unloading of ships.  This situation called on the trial judge to exercise his discretion as to whether or not to grant a temporary injunction to maintain the status quo until a full hearing could be had before the court on the merits of the case.  In his decision, he did not, in our opinion, abuse his discretion.  We find no error in the trial judge's granting the writ of temporary injunction.

The appellants also assign as error the court's overruling their demurrer to the bill of complaint. Essentially the grounds of demurrer raise the same propositions of law to which we have written in this opinion. We see no need of speaking further to these legal issues.

The decree of the court entered by the trial judge in this cause is due to be affirmed.

Affirmed.

COLEMAN, BLOODWORTH, FAULKNER, and JONES, JJ., concur.